2011 UT 54

**IVORY HOMES, LTD., Petitioner,**

v.

**UTAH STATE TAX COMMISSION, Respondent.**

No. 20090679.

Supreme Court of Utah.

Sept. 27, 2011.

Rehearing Denied Nov. 29, 2011.

David J. Crapo, Salt Lake City, for petitioner.

Mark L. Shurtleff, Att'y Gen., Susan L. Barnum, John C. McCarrey, Asst. Att'ys Gen., Salt Lake City, for respondent.

Justice NEHRING, opinion of the Court:

## INTRODUCTION

¶ 1 In this case, we review the Utah State Tax Commission's decision to deny Ivory Homes' refund request for sales tax it paid on expenses associated with concrete products that were delivered to various locations throughout Utah. We conclude that the Commission did not erroneously receive, collect, or compute any tax or overpayment that would entitle Ivory Homes to a refund under Utah Code section 59–12–110(2). We therefore affirm the Commission's decision.

## BACKGROUND

¶ 2 From July 2005 to August 2008, Ivory Homes purchased various concrete products from Jack B. Parson Companies (Parson). When Parson delivered the products, it provided an invoice that charged a single sales price without indicating any separate delivery charges. Parson calculated sales tax on that price, and Ivory Homes paid the sales tax as invoiced.

¶ 3 In 2008, Ivory Homes hired an independent consulting firm, Profit Recovery Solutions, to examine its business practices and tax liability. Through this relationship, Ivory Homes discovered that if it had structured its transactions differently with Parson and bargained for separate and independent delivery charges, the charges would not be taxable. Specifically, it realized that delivery charges are not taxable under Utah law "if separately stated on an invoice, bill of sale, or similar document provided to the purchaser."[1] With this information in hand, Ivory Homes approached Parson and asked whether Parson factored delivery costs into the price of cement and how Parson accounted for such delivery expenses. When Ivory Homes discovered that Parson tracked the expense to deliver cement for each transaction in its own internal records, Ivory Homes requested documentation providing a breakdown of the various components Parson used in calculating the sales price of the cement, including such delivery expenses. Parson obliged, providing Ivory Homes with a summary spreadsheet separating the various figures Parson used to formulate a sales price in each transaction.

¶ 4 Based on this spreadsheet, labeled "supplemental invoice," Ivory Homes filed a

---

1. Utah Code Ann. § 59–12–102(87)(c)(ii)(B) (Supp. 2011). This section has been renumbered numerous times since Ivory Homes first paid sales tax in July 2005. Because the relevant statutory language has not changed, we cite to the current version of the statute.

refund request under Utah Code section 59–12–110(2)(a) (the Refund Statute)[2] with the Utah Taxpayer Services Division. In its refund request, Ivory Homes characterized Parson's delivery expenses included in the purchase price as separate and independent nontaxable delivery charges. The Division denied the refund, and Ivory Homes requested a formal hearing before the Utah State Tax Commission.

¶ 5 The Commission also denied the refund request. After Ivory Homes presented its evidence and called its witnesses, the Commission found that Ivory Homes *"did not provide any evidence* to show that the transactions at issue were for other than delivered concrete or *that there was any error in the invoices* as originally prepared and as originally paid." The Commission reasoned that, in this case, the best evidence of the parties' intent was the original invoices. It found that if, in fact, the parties intended separate and independent delivery charges, they would have listed them as such in the original invoices, just as they had done with separate nontaxable fuel surcharges. The Commission agreed with the Division that, as a factual matter, the intent of the parties was that "the transaction, as concluded between the parties was for delivered goods rather than for goods plus separate delivery charges." The Commission stated that "[t]he provisions of Utah law allowing for the correction of errors do not allow the Taxpayer to change completed transactions for delivered goods into sales of goods plus delivery charges." Instead, the original invoices reflected transactions that contained no delivery charges— just as the parties intended at the time. Consequently, the Commission concluded that the absence of any delivery charges rendered the entire purchase price of each transaction subject to sales tax, and no refund was warranted.

¶ 6 Ivory Homes appeals. We have jurisdiction to review final orders of the Utah State Tax Commission under Utah Code section 78A–3–102(3)(e)(ii).

## STANDARD OF REVIEW

¶ 7 We defer to the Tax Commission's findings of fact and review them for substantial evidence.[3] We review the Commission's interpretations of law for correctness, granting them no deference.[4]

## ANALYSIS

¶ 8 Utah Code section 59–12–102(87)(c)(ii)(B) exempts delivery charges from taxation if, and only if, there are separate delivery charges that are also documented.[5] Below, the Commission found, as a factual matter, that there were no delivery charges in the original transaction. We decline to disturb this finding of fact and therefore affirm the Commission's decision that Ivory Homes is not entitled to a refund.

¶ 9 Alternatively, a plain language analysis of the Refund Statute supports affirming the Commission's decision. The Refund Statute requires that "the [C]ommission erroneously receive[ ]" a tax to warrant a refund.[6] This language requires the Tax Commission to fail in one of its duties when it receives the tax before the statute is triggered. Here, Ivory Homes has not alleged that the Commission erred in any way when it received the taxes at issue. Thus, we also affirm the Commission's decision to deny a refund under the plain language of the Refund Statute because the Commission did not erroneously receive the taxes paid by Ivory Homes.

¶ 10 Finally, any ambiguity in the Refund Statute must be narrowly construed against the taxpayer. Operation of the Refund Statute creates a tax credit and is a matter of legislative grace. When a statute that provides a tax concession is unclear, the

---

**2.** *Id.* § 59–12–110(2) (2008). In 2009, the Refund Statute was substantively changed. *See id.* § 59–12–110 (Supp.2011). Throughout this opinion, we cite to the 2008 version of the Refund Statute which governs Ivory Homes' refund requests.

**3.** Utah Code Ann. § 59–1–610(1)(a) (2008).

**4.** *Id.* § 59–1–610(1)(b).

**5.** Utah Code Ann. § 59–12–102(87)(c)(ii)(B) (Supp. 2011).

**6.** *Id.* § 59–12–110(2)(a) (2008).

ambiguity is construed against the taxpayer until the legislature indicates a contrary intention. Thus, to the degree it is ambiguous, we affirm the Tax Commission's narrow application of the Refund Statute and the denial of Ivory Homes' refund request.

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S FACTUAL FINDING THAT THERE WERE NO DELIVERY CHARGES IN THE ORIGINAL TRANSACTIONS

¶ 11 The parties' intent that no delivery charges were included in the original transaction is a finding of fact which we decline to disturb. We defer to the Commission's findings of fact and disturb them only if they are not supported by substantial evidence.[7] "A decision is supported by substantial evidence if there is a 'quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion.'"[8] "On appeal from an order of an administrative agency, the appealing party ... 'bears the burden of demonstrating that the agency's factual determinations are not supported by substantial evidence ... [and] we state the facts and all legitimate inferences drawn therefrom in the light most favorable to the agency's findings.'"[9]

¶ 12 Where, as here, the original written contract to a transaction is missing a term that renders the contract ambiguous,[10] we allow the parties to present extrinsic evidence of their intent to clarify the ambiguity.[11] We do not, however, allow the parties to change or rewrite their original agreement. Instead, the fact-finding body is charged with the responsibility to consider the extrinsic evidence to determine the intent of the parties at the moment of contracting.[12] The discernment of this intent is a question of fact.[13]

¶ 13 At the formal hearing, Ivory Homes had the opportunity to present extrinsic evidence that there were improperly taxed delivery charges in the original transaction. Presumably, Ivory Homes offered the supplemental invoice, first, as extrinsic evidence that there were delivery charges, and second, to fulfill the requirement of Utah Code section 59–12–102(87)(c)(ii)(B) that such delivery charges be separately stated.[14] After Ivory Homes presented this evidence, the Commission nevertheless found that there were, in fact, no such delivery charges. Thus, the fact that the supplemental invoice separately listed the purported charges became irrelevant. Ivory Homes has not provided an adequate argument as to why we should overturn this factual finding.

¶ 14 Contrary to the dissent's assertion, we express no opinion regarding a taxpayer's ability to correct errors through post-transaction documentation. However, before delivery charges can escape taxation outside of the purchase price, a party must establish that they exist. Ivory Homes attempted to do this through the presentation of its sup-

---

7. Utah Code Ann § 59–1–610(1)(a) (2008).

8. *Kennon v. Air Quality Bd.*, 2009 UT 77, ¶ 28, 270 P.3d 417, 2009 WL 4406139 (quoting *Associated Gen. Contractors v. Bd. of Oil, Gas & Mining*, 2001 UT 112, ¶ 21, 38 P.3d 291).

9. *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 1 n. 1, 211 P.3d 382 (second and third alterations in original) (quoting *Zissi v. State Tax Comm'n*, 842 P.2d 848, 852 (Utah 1992)).

10. *See Daines v. Vincent*, 2008 UT 51, ¶ 29, 190 P.3d 1269 (noting that ambiguity may arise where a contract is missing terms).

11. *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 19, 54 P.3d 1139 ("[I]f the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement, extrinsic evidence must be looked to in order to determine the intentions of the parties." (internal quotation marks omitted)); *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 18, 48 P.3d 918 ("If the contract is found to be ambiguous, the court may consider extrinsic evidence of the parties' intentions.").

12. *WebBank*, 2002 UT 88, ¶ 19, 54 P.3d 1139 ("Such ambiguity may be resolved only by the trier of fact after consideration of parol or extrinsic evidence as to the parties' intentions....").

13. *Id.* ¶ 22 ("'When ambiguity exists, the intent of the parties becomes a question of fact.'" (quoting *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 14, 28 P.3d 669)).

14. Utah Code Ann. § 59–12–102(87)(c)(ii)(B) (Supp.2011).

plemental invoice. The Commission had the opportunity to weigh this evidence along with any accompanying testimony. Simply stated, the Commission did not consider the supplemental invoice sufficient to establish the existence of delivery charges—a reasonable conclusion given that the invoice was created up to three years after the transactions. We have no reason to disturb this finding.

¶ 15 The dissent dismisses the Commission's distinction between delivery charges and a seller's delivery expense factored into the purchase price. It reasons that so long as some portion of payment is dedicated to an activity that falls within the definition of delivery charges contained in Utah Code section 59-12-102(29),[15] that portion would not be taxable.[16] We agree, but that is not what occurred in this case. The fact that Parson unilaterally calculated and tracked different prices based on whether it had to transport cement to complete the sale does not convert a portion of the purchase price into a delivery charge. Instead, a delivery charge is an independently bargained-for contractual term. This is reflected by the statutory definition of "purchase price" which excludes "delivery charges" only "if separately stated on an invoice, bill of sale, or similar document provided to the purchaser."[17] Otherwise, a buyer could retroactively exempt a portion of a purchase price from taxes anytime the buyer established that the vendor incurred expenses transporting the merchandise to a designated point of sale. However, a vendor's unexpressed motive for negotiating a certain sales price does not somehow dedicate a portion of the price to that motive. Rather, as with any other contractual term, such a "dedication" requires a bilateral meeting of the minds.[18] Had the parties bilateral-

ly "dedicated" a portion of the purchase price to delivery charges, we would have no occasion to hear this case. However, the Commission found, as a matter of fact, that the parties' original transactions never contained such a dedication of delivery charges nor were such separate charges intended. Applying the appropriate standard of review, we cannot overturn those factual findings.

¶ 16 Moreover, the form in which a transaction is structured often creates very different tax consequences given that our tax code is highly sensitive to such form. In *Institutional Laundry, Inc. v. Utah State Tax Commission*,[19] we explicitly recognized the significance of the form in which taxpayers structure their transactions. In *Institutional Laundry*, the Commission assessed sales tax on a wholly-owned subsidiary for laundry services it provided to its parent corporation.[20] The parent corporation eventually absorbed its subsidiary, and the subsidiary became a division of the parent. As such, their transactions were no longer taxable.[21] The corporation argued that the substantive transactions between the entities had not changed and therefore the prior transactions during the time frame in which the parent and subsidiary were separate legal entities should not be taxable.[22] In recognizing the importance of form under our tax law, we held that, "[w]hen a taxpayer has chosen to conduct business under a particular arrangement, it cannot disregard the consequence of that arrangement when it would otherwise be to the taxpayer's disadvantage."[23]

¶ 17 Similarly, the form in which Ivory Homes and Parson chose to arrange their transactions cannot be dismissed as inconsequential simply because Ivory Homes may now suffer an unfavorable tax consequence.

**15.** "'Delivery charge' means a charge ... by a seller of ... tangible personal property ... for preparation and delivery of the tangible personal property ... to a location designated by the purchaser." *Id.* § 59-12-102(29)(a).

**16.** *See infra* ¶¶ 41-43.

**17.** *Id.* § 59-12-102(87)(c)(ii)(B).

**18.** *See Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 11, 78 P.3d 600 ("'It is fundamental that a meeting of the minds on the integral features of an agree-

ment is essential to the formation of a contract.'" (quoting *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996))).

**19.** 706 P.2d 1066 (Utah 1985) (per curiam).

**20.** *Id.* at 1067.

**21.** *Id.*

**22.** *Id.* at 1067-68.

**23.** *Id.* at 1067.

Ivory Homes' reasons for structuring its transactions in the form in which it did are not entirely clear and may very well have been an oversight. Nonetheless, the Commission found that there was insufficient evidence that the parties intended an alternative form that would have provided separate and nontaxable delivery charges.

¶ 18 Furthermore, the importance of form in our tax laws becomes readily apparent when examining the statute at issue. Utah Code section 59–12–102(87)(c)(ii)(B) allows delivery charges to escape taxation only "if separately stated on an invoice, bill of sale, or similar document provided to the purchaser."[24] In applying the statute, the substance (delivery charges) becomes irrelevant without the form (a separate statement). We cannot minimize the formalities of our tax system. A tax scheme that disregards form is a danger not only to the taxed citizen, but to the government upon which the citizens rely to uniformly and predictably apply such a tax.

¶ 19 The Tax Commission found that there were no actual delivery charges in the transactions as originally intended and completed. We decline to disturb that factual finding under the appropriate "substantial evidence" standard of review.

II. THE PLAIN MEANING OF SECTION 59–12–110(2)(A) REQUIRES COMMISSION ERROR BEFORE A TAXPAYER IS ENTITLED TO A REFUND

¶ 20 Even if there had been separate delivery charges, Ivory Homes would not be entitled to a refund because a plain language interpretation of the Refund Statute's requirement that "the [C]ommission erroneously receive[ ] . . . [a] tax"[25] contemplates some mistake on the part of the Commission. Ivory Homes has not alleged that the Commission made any error in receiving its payment of taxes. Therefore, Ivory Homes is not entitled to a refund.

¶ 21 When interpreting statutory language, our primary objective is to ascertain the intent of the legislature.[26] To discern legislative intent, we first look to the plain language of the statute.[27] "We presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning."[28] However, "our plain language analysis is not so limited that we only inquire into individual words and subsections in isolation; our interpretation of a statute requires that each part or section be 'construed in connection with every other part or section so as to produce a *harmonious whole*.' "[29]

¶ 22 When the subsections that compose the Refund Statute are reconciled with each other and read as a whole, it becomes clear that the Statute demands that the Commission err before a taxpayer is entitled to a refund. The first three subsections of Utah Code section 59–12–110(1) impose specific duties upon the Commission in its receipt of taxes. These duties consist of (1) examining returns for apparent errors, (2) recomputing tax upon discovery of an error, and (3) crediting the taxpayer if there is an overpayment. The Commission must have failed in one of these duties for Ivory Homes to be entitled to a refund.

¶ 23 The opening sentence of the Refund Statute imposes a duty upon the Commission that "[a]s soon as practicable after a return is filed, *the [C]ommission shall examine* the return."[30] The position of this duty in the overall structure of the Refund Statute is

24. Utah Code Ann. § 59–12–102(87)(c)(ii)(B).

25. Utah Code Ann. § 59–12–110(2)(a) (2008).

26. *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135.

27. *Id.*

28. *Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-Day Saints*, 2007 UT 42, ¶ 46, 164 P.3d 384 (internal quotation marks omitted).

29. *Anderson v. Bell*, 2010 UT 47, ¶ 9, 234 P.3d 1147 (quoting *Sill v. Hart*, 2007 UT 45, ¶ 7, 162 P.3d 1099).

30. Utah Code Ann. § 59–12–110(1)(a) (emphasis added).

significant because it sets the stage for interpreting the rest of the Statute's subsections.

¶ 24 The subsections that follow reflect a cumulative progression of duties imposed upon the Commission from the starting point at which it examines a return. Subsection 59–12–110(1)(b) states that upon such examination, "[i]f the [C]ommission determines that the correct amount of tax . . . is greater or less than the amount *shown* to be due on the return, the *[C]ommission shall recompute* the tax." [31] Then, under subsection 59–12–110(1)(c), after the Commission recomputes the tax, "[i]f the amount paid exceeds the amount due, the excess, plus interest . . . shall be credited or refunded to the taxpayer." [32] When viewed in this light and read as a whole, the entirety of subsection 59–12–110(1) refers only to the duties and procedure of the Commission in examining filed returns.

¶ 25 While the subsection contemplates that a taxpayer may make a typographical or computational error and preserve the right to a refund, it is operative only insofar as it imposes a duty upon the Commission to examine returns for these clerical mistakes. If the Commission were to err in its execution of that duty, it would receive the taxes in error. However, the subsection does not apply to a situation where there are no outward indicia that the taxpayer has failed to categorize and document nontaxable funds. To the degree that Ivory Homes relies on subsection 59–12–110(1) in support of its theory that taxpayer error is encompassed in the refund requirement that "the [C]ommission erroneously receive[ ]" taxes, that reliance is misplaced. For subsection 59–12–110(1) to be relevant here, the Commission would have had to fail in its duty to properly examine returns and/or recompute taxes. There has been no allegation that the Commission committed any such error. Therefore, subsection 59–12–110(1) simply does not apply. [33]

¶ 26 Whereas subsection (1) of the Refund Statute imposes specific duties upon the Commission, subsection (2) provides the grounds for which a refund is due. Notably, subsection (2) structurally separates taxpayer actions that would warrant a refund from the erroneous actions that, if committed by the Commission, would justify the same result. Subsection 59–12–110(2) limits taxpayer errors that create tax refunds to situations in which "a *taxpayer* pays a tax, penalty, or interest more than once." [34] This clause is followed by the word "*or*"—"to indicate an alternative between two different or unlike things." [35] Thereafter, the subsection shifts to errors committed by the Commission that would give rise to a refund, specifically that "*the [C]ommission* erroneously receive[ ], collect[ ], or compute[ ] any tax." [36]

¶ 27 The dissent fails to apprehend the structural separation within the statute of the taxpayer and the commission actions that would create a right to a refund. Instead, it reasons that when one "erroneously receives" a telephone call, it is commonly understood that the caller, not the recipient, has commit-

---

**31.** *Id.* § 59–12–110(1)(b) (emphases added).

**32.** *Id.* § 59–12–110(1)(c).

**33.** The dissent reasons that under subsection (1)(c), "[b]ecause an 'overpayment' is an express basis for a refund . . . Ivory Homes is entitled to a refund." *See infra* ¶ 49. However, the dissent misapprehends the significance of an overpayment in the Refund Statute. Section 59–12–110(2)(a) provides that a refund is due if "the [C]ommission erroneously *receives* . . . any tax . . . including an overpayment." (Emphasis added). Under this language, the Refund Statute requires that the Commission *receive* an overpayment before any refund is due. However, it is undisputed that when the Commission received the tax submission, there was no overpayment because the purported delivery charges had not been "separately stated on an invoice, bill of sale, or similar document." *See* Utah Code Ann. § 59–12–102(87)(c)(ii) (Supp.2011). Until any purported delivery charges are so "separately stated," they are taxable as part of the purchase price. Thus, at the time the Commission received the tax submission, it was not an overpayment, and the Refund Statute could not be applied on that basis.

**34.** Utah Code Ann. § 59–12–110(2)(a) (emphasis added).

**35.** Webster's Third New International Dictionary 1585 (1961).

**36.** Utah Code Ann. § 59–12–110(2)(a) (emphasis added).

ted the error.[37] This analogy is unfitting because the phrase "erroneously receives" exacts a specific meaning in the context of monetary payment where there is a duty imposed. A more congruous comparison to the case presented is that of a store clerk whose job responsibilities consist of computing accurate prices at the time and point of sale. If such a clerk were to "erroneously receive" payment, it would be clear that the clerk had committed some mistake in the fulfillment of his duties. Similarly, for the Commission to have erroneously received taxes, it must have erred in respect to some obligation with which it was charged. There has been no allegation that the Commission erred, and therefore, Ivory Homes is not entitled to a refund.

¶ 28 Moreover, had the legislature intended that taxpayer error be encompassed in the phrase "the [C]ommission erroneously receive[ ] ... [a] tax," it could have obviated the entire subsection by simply stating that a refund is warranted whenever "a taxpayer erroneously pays a tax." The legislature did not do so. Instead, it chose to structurally separate the taxpayer and commission actions that would justify a refund. An examination of this structure and the plain language of the statute requires that the Commission commit some error before a refund should be granted on the basis that "the [C]ommission erroneously receive[d] ... [a] tax."

¶ 29 This reading of section 59–12–110(2), requiring commission error before a tax refund may be granted, is supported by our cases that interpret similar tax refund statutes. For example, in *Shea v. State Tax Commission*, we considered a statute that provided a tax refund if "the [Commission] *through error* collects any fee not required to be paid."[38] In that case, the plaintiff sought to recover diesel fuel taxes paid under a statute that was later held to be unconstitutional.[39] We rejected the plaintiff's claim that the taxes were collected "through error" and held that the statute only authorized a refund for "collections which the officials could themselves have determined at the time of collection that they should not collect."[40] Similarly, in *CIG Exploration v. Utah State Tax Commission*, we addressed whether the plaintiff was entitled to a refund of ad valorem taxes under a statute that provided a refund for "[a]ny taxes ... erroneously or illegally collected."[41] We held that "the term 'erroneously or illegally collected' does not include ad valorem taxes paid on the basis of a valuation which was correct as of the time it was made but which is later alleged to have been erroneous due to factors not existing at the time of the valuation."[42] Finally, in *Woodbury Amsource v. Salt Lake County*, we considered a statute that required a refund of "[a]ny taxes ... erroneously or illegally collected."[43] We held that the error "must be of a type that is readily apparent from county records."[44]

¶ 30 These cases make clear that a taxpayer is entitled to a refund under section 59–12–110(2) only if the Commission fails in its duty to examine filed returns or commits some other error at the time the Commission "receives, collects, or computes ... any tax." Because the Commission has made no such error, Ivory Homes is not entitled to a refund.

### III. TAX REFUND STATUTES ARE SUBJECT TO STRICT CONSTRUCTION

¶ 31 To the extent that the plain language is not clear, we construe the Refund Statute narrowly against the taxpayer. We generally construe tax imposition stat-

---

37. *See infra* ¶ 48.

38. 101 Utah 209, 120 P.2d 274, 275 (1941) (emphasis added) (internal quotation marks omitted).

39. *Id.* at 274.

40. *Id.* at 276.

41. 897 P.2d 1214, 1215 (Utah 1995) (second alteration in original) (internal quotation marks omitted).

42. *Id.* at 1216.

43. 2003 UT 28, ¶ 9, 73 P.3d 362 (internal quotation marks omitted).

44. *Id.* ¶ 15.

utes liberally in favor of the taxpayer.[45] But the Refund Statute imposes no tax. Instead, the Refund Statute provides a tax credit.[46] Similar to deductions and exemptions, such credits are matters of legislative grace and should be construed in favor of the taxing entity where legislative intent is not clear.[47]

¶ 32 The Alabama Court of Civil Appeals has explained the demand for narrowly construing credit and refund statutes, stating:
> It is well settled that the right to reclaim money voluntarily paid to the state ... as taxes, is a creature of legislative grace. Like tax exemptions, tax refunds are to be construed in favor of the taxing authority. The right of taxation is essential to the existence of all governments, and it is never to be presumed that this right is abandoned or surrendered unless it clearly appears that such was the intention.[48]

¶ 33 The dissent contends that the plain meaning of the phrase "the [C]ommission erroneously receives ... any tax" encompasses circumstances in which the taxpayer that erroneously pays a tax even though such error would be unapparent to the Commission.[49] If in fact the dissent's interpretation is reasonable, at most it exemplifies the statute's ambiguity given that the phrase can reasonably be interpreted as requiring commission error in its receipt of the tax. Faced with choosing between these two interpretations, we must resort to the narrower interpretation based on the canon of construction applied to other tax concessions granted through legislative grace. Thus, any ambiguity in the phrase "the [C]ommission erroneously receives" must be resolved against the taxpayer and in favor of the

Commission. As a result, we hold that the Commission must err in one of its statutorily imposed duties for it to "erroneously receive[ ] ... [a] tax" under the Refund Statute, and Ivory Homes is not entitled to a tax refund.

## CONCLUSION

¶ 34 Under a substantial evidence standard of review, we decline to disturb the Commission's findings of fact that the parties did not intend delivery charges in their original transactions.

¶ 35 Alternatively, a plain language interpretation of the Refund Statute requires that the Tax Commission commit some error in its receipt of taxes before a taxpayer is entitled to a refund. The Refund Statute does not impose a tax but rather provides tax relief and is a matter of legislative grace. Such statutes are subject to strict construction and any ambiguity must be resolved in favor of the Tax Commission. Accordingly, we affirm the Tax Commission's decision that it did not erroneously receive any tax, and Ivory Homes is not entitled to a tax refund.

¶ 36 Chief Justice DURHAM and Justice PARRISH concur in Justice NEHRING's opinion.

Associate Chief Justice DURRANT, dissenting:

¶ 37 I respectfully dissent. In the instant case, we are asked to determine whether Ivory Homes is entitled to a refund for sales tax it paid on delivery charges that were not separately stated in invoices it received at

---

**45.** *See Cnty. Bd. of Equalization v. Utah State Tax Comm'n*, 944 P.2d 370, 373–74 (Utah 1997) ("It is an established rule in the construction of tax statutes that if any doubt exists as to the meaning of the statute, our practice is to construe taxation statutes liberally in favor of the taxpayer, leaving it to the legislature to clarify an intent to be more restrictive if such intent exists." (internal quotation marks omitted)).

**46.** *See* Utah Code Ann § 59–12–110(2)(a)(i) (2008).

**47.** *See MacFarlane v. Utah State Tax Comm'n*, 2006 UT 25, ¶¶ 11, 19 n. 10, 134 P.3d 1116 (declining to apply strict construction because

there was no ambiguity, but stating "the reason for the rule of strict statutory construction. Because tax credits and exemptions are matters of legislative grace, courts may rightly infer that the [l]egislature would not want to extend that grace too far, but rather would seek to limit its application to a select group for a specific reason." (internal quotation marks omitted)).

**48.** *State Dep't of Revenue v. Wells Fargo Fin. Acceptance Ala., Inc.*, 19 So.3d 892, 894 (Ala.Civ. App.2008) (alterations omitted) (internal quotation marks omitted).

**49.** *See infra* ¶ 45.

the time of several transactions, but *were* separately stated in subsequently provided, corrected invoices. Our resolution of this question requires interpretation of two statutes. The first statute, section 59–12–102 of the Utah Code (the Definitions Statute), states that delivery charges are not included in a purchase price—and are therefore exempt from taxation—"if separately stated on an invoice, bill of sale, or similar document provided to the purchaser." [1] The second relevant statute, section 59–12–110 of the Utah Code (the Refund Statute), provides that a taxpayer is entitled to a refund if the "taxpayer pays a tax, penalty, or interest more than once or the [C]ommission erroneously receives, collects, or computes any tax, penalty, or interest, *including an overpayment.*" [2]

¶ 38 Based on its interpretation of these statutes, the majority holds that Ivory Homes is not entitled to a refund from the Commission. In reaching this decision, the majority asserts that the Commission found, as a matter of fact, that "there were no delivery charges in the ... transaction" between Ivory Homes and Parson.[3] Additionally, the majority states that because the Commission found that the parties did not intend to separately state the delivery charges in the initial transaction, "the supplemental invoice [that] separately listed the purported charges became irrelevant." [4] Finally, the majority concludes that "[e]ven if there had been separate delivery charges, Ivory Homes would not be entitled to a refund because a plain language interpretation of the Refund Statute's requirement that 'the [C]ommission erroneously receive[ ] ... [a] tax' contemplates some mistake on the part of the Commission." [5]

¶ 39 I disagree with all three of these conclusions. First, I do not agree that the Commission found, as a matter of fact, that the purchase price charged by Parson did not include a specific amount dedicated to delivery charges. Instead, I believe that the Commission's factual findings support the conclusion that a portion of the price Ivory Homes paid to Parson was dedicated to delivery charges. Second, although I agree that the Commission found, as a matter of fact, that the parties did not intend for the delivery charges to be separately stated in the original invoices, I do not agree that this intent prohibited the parties from subsequently correcting the invoices to separately state the delivery charges. Rather, in my view, the plain language of the Definitions Statute provides that delivery charges are nontaxable any time they are separately stated in an invoice or similar document, even if the document is provided to a purchaser after an initial transaction. Finally, I disagree that the Refund Statute's use of the phrase "erroneously receives" requires that an error be made *by the Commission* before a taxpayer is entitled to a refund. Instead, I believe that the Refund Statute's statement that a taxpayer is entitled to a refund whenever a taxpayer makes an *overpayment* indicates that the phrase "erroneously receives" contemplates refunds not only for errors made by the Commission but also for errors made by a taxpayer.

¶ 40 Because a portion of the sales price that Ivory Homes paid to Parson was dedicated to delivery charges and because these delivery charges have been separately stated on invoices provided to the Commission, I would hold that this portion of the purchase price is not taxable. Additionally, because Ivory Homes made an overpayment by paying sales tax that it was not, with proper documentation, required to pay, I would hold that the Commission erroneously received the tax and that Ivory Homes is therefore entitled to a refund.

1. Utah Code Ann. § 59–12–102(87)(c)(ii)(B) (Supp. 2011).

2. *Id.* § 59–12–110(2)(a) (2008) (emphasis added). In 2009, the Refund Statute was substantively changed. *See id.* § 59–12–110 (Supp.2011). Throughout this dissenting opinion, I therefore cite to the 2008 version of the statute, which governs Ivory Homes' refund requests.

3. *Supra* ¶ 8.

4. *Supra* ¶ 13.

5. *Supra* ¶ 20 (quoting Utah Code Ann. § 59–12–110(2)(a) (2008)).

## I. THE TAX COMMISSION DID NOT FIND, AS A MATTER OF FACT, THAT THERE WERE NO DELIVERY CHARGES IN THE ORIGINAL TRANSACTIONS

¶ 41 In paragraph fifteen of its opinion, the majority states that "the Commission found, as a matter of fact, that the parties' original transactions never contained ... delivery charges" and that such separate charges were never intended. I agree with the majority that the Commission found, as a matter of fact, that the parties did not *intend* to include separately stated delivery charges in the original invoices given to Ivory Homes and that this finding is entitled to substantial deference. But I disagree with the majority's assertion that the Commission found, as a matter of fact, that no part of the sales price Ivory Homes paid to Parson was dedicated to delivery charges.

¶ 42 In its findings of fact, the Commission expressly noted that Parson had provided evidence demonstrating that it sold ready-mix concrete to customers that did not require delivery "at a *reduced price* compared to ready-mixed concrete products with delivery." The Commission also noted that Parson's "accounting system allowed for the tracking of delivery charges as a *separate* item from the cost of the products themselves" and that Parson had appeared at a hearing and provided evidence "as to what would have been the amounts of the delivery charges if they had been separately identified on [Parson's] invoices."

¶ 43 In my view, these findings of fact support the conclusion that the purchase price on the invoices received by Ivory Homes *did* include a specific amount that was dedicated to delivery charges. Specifically, the portion of the purchase price dedicated to delivery charges represents the difference between the amount Parson charged for delivered concrete and the amount Parson charged for nondelivered concrete. This portion is reflected in the corrected invoices and similar documents that Parson provided to the Commission. Accordingly, because the Commission's factual findings suggest that a portion of the purchase price paid to Parson was dedicated to delivery charges, I disagree with the majority's conclusion that the Commission found, as a matter of fact, that the original transaction did not include any amount dedicated to delivery charges.

## II. UNDER THE DEFINITIONS STATUTE'S PLAIN LANGUAGE, IVORY HOMES' DELIVERY CHARGES ARE NOT TAXABLE BECAUSE THEY ARE SEPARATELY STATED IN INVOICES AND SIMILAR DOCUMENTS

¶ 44 Although the Commission's factual findings support the conclusion that the purchase prices in the original transactions between the parties included a delivery charge, it is undisputed that the original invoices did not separately state those delivery fees. We therefore must decide whether a party can modify or correct an invoice to separately state a delivery charge when that charge was not separately stated on the original invoice. In paragraph fifteen of its opinion, the majority agrees that "so long as some portion of payment is dedicated to an activity that falls within the definition of delivery charges contained in [the Definitions Statute], that portion would not be taxable." The majority therefore reasons that had Ivory Homes intended to dedicate a portion of its payment to delivery charges, that amount would not be taxable. But the majority concludes that Ivory Homes did not dedicate a portion of its payment to delivery charges because it did not intend to separately state the delivery charges in the original invoices. In reaching this conclusion, the majority appears to accept the Commission's *legal* conclusion that taxpayers can correct an invoice only when they introduce evidence demonstrating that they intended, at the time of the original transaction, for the delivery charges to be separately stated. To the extent that the majority adopts this rule, I disagree.

¶ 45 The plain language of the Definitions Statute excludes delivery charges from taxation if a purchaser is provided with "an in-

voice, bill of sale, or similar document" that separately states the delivery charges.[6] Nothing in the language of this provision requires that delivery charges be listed in an initial invoice. Additionally, nothing in the language of the Refund Statute suggests that a party must intend to separately state delivery charges at the time of the original transaction or that a party will be prohibited from correcting an initial invoice absent evidence of such intent. Instead, under the plain language of the Definitions Statute, the determination of whether a delivery charge is taxable depends *solely* on whether that charge has, at some time, been separately stated in "an invoice, bill of sale, or similar document" that has been provided to the purchaser.[7]

¶ 46 As noted above, it is undisputed that the original invoices that Parson provided to Ivory Homes did *not* separately state the portion of the purchase price that was dedicated to delivery charges. But it is also undisputed that, after these transactions, Parson provided Ivory Homes with corrected invoices and spreadsheets that *did* separately state the delivery charges. In my view, this is all that the plain language of the Definitions Statute requires to render delivery charges nontaxable. Specifically, pursuant to the Definitions Statute's plain language, the delivery charges that Ivory Homes paid for became nontaxable once they were separately stated on the corrected "invoice[s], bill[s] of sale, or similar document[s]."[8] Accordingly, because the delivery charges were separately stated on the corrected invoices and similar documents provided to Ivory Homes, I would hold that those charges are exempt from taxation.

**6.** UTAH CODE ANN. § 59–12–102(87)(c)(ii)(B) (Supp. 2011).

**7.** *See id.*

**8.** *Id.*

**9.** *Supra* ¶ 20 (quoting UTAH CODE ANN. § 59–12–110(2)(a) (2008)).

**10.** UTAH CODE ANN § 59–12–110(2)(a) (2008) (emphases added).

**11.** *Id.* § 59–12–110(1)(c).

## III. THE PLAIN LANGUAGE OF THE REFUND STATUTE PERMITS A TAXPAYER TO RECEIVE A REFUND WHEN THE TAXPAYER MAKES AN OVERPAYMENT

¶ 47 In addition to concluding that the original transactions between Ivory Homes and Parson did not include delivery charges, the majority concludes that, even if they had "Ivory Homes would not be entitled to a refund because a plain language interpretation of the Refund Statute's requirement that 'the [C]ommission erroneously receive[ ] . . . [a] tax' contemplates some mistake on the part of the Commission."[9]

¶ 48 I agree with the majority that, in some instances, the phrase "erroneously receives" may contemplate an error on the part of a receiving party, such as the Commission. But the phrase may also be used to describe an error made by someone other than the receiver. For instance, one may erroneously receive a phone call from a wrong-number dialer; an attorney may erroneously receive privileged information that opposing counsel did not mean to disclose; or one might erroneously receive payment for work not yet completed. In each of these instances, the error committed is not made by the receiver, but by the caller, sender, or payor, respectively.

¶ 49 Ultimately, however, I see no reason to engage in a linguistic debate about which usage of this phrase is more common because the Refund Statute expressly states that a taxpayer is entitled to a refund "[i]f . . . the [C]ommission *erroneously receives* . . . any tax, . . . *including an overpayment.*"[10] An overpayment occurs whenever the "amount [of tax] paid exceeds the amount due."[11] This is precisely what occurred in this case.[12]

**12.** The majority argues that Ivory Homes did not make an overpayment "because the purported delivery charges had not been separately stated on an invoice, bill of sale, or similar document" at the time that the Commission received the tax submission. *Supra* ¶ 25 n. 33 (internal quotation marks omitted). I disagree with the majority's interpretation of "overpayment." Specifically, I do not agree that, in determining whether there has been an overpayment, the Commission may look only at the documents filed at the time the tax was paid. In my view, the Refund Statute provides that an overpayment exists as long as the Commission has received a payment that exceeds the amount due. *See* UTAH CODE ANN.

As explained above, once the delivery fees charged by Parson were separately stated on corrected invoices, those fees became nontaxable. Thus, any sales tax paid by Ivory Homes on the separately stated delivery fees exceeded the amount of tax actually due and constituted an overpayment. Because an "overpayment" is an express basis for a refund under subsection 110(2)(a) of the Refund Statute, I would hold that Ivory Homes is entitled to a refund.

¶ 50 The majority dismisses the statutory reference to an "overpayment" as "refer[ring] only to the duties and procedure of the Commission in examining filed returns." [13] Specifically, the majority suggests that a refund for an overpayment is available only where the Commission commits an error "in its execution of th[e] duty" to "examine returns for ... clerical mistakes." [14] But I cannot see how this limitation can be reconciled with the text of the Refund Statute. There is simply no language in the Refund

Statute suggesting that refunds for overpayments are limited to overpayments caused by the Commission's clerical mistakes. Moreover, contrary to the majority's suggestion, nothing in the statutory text restricts the right of a refund to instances where an overpayment is detected by the Commission. Instead, in subsection (2), the provision that the majority believes "provides the grounds for which a refund is due," [15] the Refund Statute unequivocally prescribes a right to a refund for "an overpayment described in Subsection (1)(c)." [16] The "overpayment described in Subsection (1)(c)," in turn, says nothing about "clerical mistakes" or overpayments detected by the Commission. It simply describes an overpayment as a tax payment that "exceeds the amount due." [17] In my view, that plain language is dispositive. I would therefore reverse the Commission's decision and hold that Ivory Homes is entitled to a refund.[18]

§ 59–12–110(1)(c). If taxpayers can show that they paid an amount greater than the amount ultimately due, they have made an overpayment and are entitled to a refund. Thus, I believe taxpayers can correct errors in the calculation of their tax by submitting post-transaction documentation.

In contrast, the majority's interpretation of "overpayment" appears to foreclose a taxpayer's ability to correct many errors. Under the majority's analysis, an overpayment can only exist—and therefore only be corrected—at the moment the tax is originally paid. *See supra* ¶ 25 n. 33. In practice then, subsequent invoices cannot be created and filed to correct the amount of the tax that is due. By essentially foreclosing a taxpayer's ability to correct the amount due, the majority's interpretation is at odds with its assertion that it "express[es] no opinion regarding a taxpayer's ability to correct errors through post-transaction documentation." *Supra* ¶ 14.

13. *Supra* ¶ 24.

14. *Supra* ¶ 25.

15. *Supra* ¶ 26.

16. Utah Code Ann. § 59–12–110(2)(a).

17. *Id.* § 59–12–110(1)(c).

18. I also disagree with the majority's attempt to sustain its contrary view on the basis of a canon of statutory interpretation that requires strict construction of tax credit statutes. *Supra* ¶¶ 31–33. In my view, the distinction between affirmative "tax imposition statutes" and a negative "tax

credit" is untenable. *See supra* ¶ 31. A party's effective tax rate is generated by the net application of all relevant tax provisions. I cannot follow the logic of construing one side of that net equation liberally and the other side strictly.

Moreover, I am unpersuaded by the notion that tax credits—but not tax impositions—are "matters of legislative grace" that lend themselves to strict construction. *Supra* ¶ 31. At some level, any legislative act is a matter of "grace," in that all statutes stop short of an extreme that would impose greater hardships on the regulated parties. And that is surely true of "tax imposition statutes," which decline to impose an even higher tax rate. In that sense, "tax imposition statutes" are every bit as much a matter of "grace" as tax credit statutes, and thus both are logically as worthy of strict construction in favor of the taxing authority.

Finally, I believe that the line between the two is ultimately unworkable. The Refund Statute can be characterized as a "credit" provision in the sense that it prescribes a procedure for taxpayer recovery of taxes that are erroneously received. But the statute is every bit as much an integral part of the underlying "tax imposition statute," in that it sets forth a mechanism for ensuring that the amount paid is the correct amount of tax originally imposed.

Because of these concerns, I do not think that we should assume that the legislature exaggerates its tax refund enactments or understates its tax imposition statutes. Instead, we should presume that the legislature means what it says and interpret tax refund provisions the same way that we construe other statutes.

¶ 51 Justice LEE concurs in Associate Chief Justice DURRANT's dissenting opinion.