2012 UT 91

**SUMMIT OPERATING, LLC, Petitioner,**

v.

**UTAH STATE TAX COMMISSION and Auditing Division of the Utah State Tax Commission, Respondents.**

No. 20110087.

Supreme Court of Utah.

Dec. 21, 2012.

---

Mark L. Shurtleff, Att'y Gen., Clark L. Snelson, Asst. Att'y Gen., Salt Lake City, for respondents.

Jeremy C. Schwendiman, Thomas W. Bachtell, Salt Lake City, for petitioner.

## AMENDED OPINION *

Chief Justice DURRANT, opinion of the Court:

### INTRODUCTION

¶ 1 This case requires us to determine when a well "started" under section 59–5–102 of the Utah Code. Although that statute imposes a severance tax on oil or gas produced from a well,[1] section 59–5–102(5)(c) (Tax Exemption Statute) permits an exemption for "the first six months of production for development wells started after January 1, 1990."[2] Summit Operating, LLC (Summit)

---

* Corrections were made in the header for Part I and in the text of paragraph ten.

1. Utah Code § 59–5–102(1)–(2).

2. *Id.* § 59–5–102, (5)(c). Although the 2008 version of the Utah Code is the version applicable to this case, because there have been no substantive changes to the relevant statutes since 2008, we refer to the current version of the Utah Code for convenience unless otherwise indicated.

argues that a well starts when it begins commercial production. Under this interpretation, Summit asserts that it is entitled to a six-month tax exemption for its well, which started commercial production in 2008. The Utah State Tax Commission (Commission) asserts that a well starts on the date that drilling begins. Under this interpretation, the Commission asserts that Summit is not entitled to the tax exemption because drilling for Summit's well began in 1983.

¶ 2 We conclude that the language of the Tax Exemption Statute indicates that a well "starts" when drilling begins; that is, a well "starts" when it is spudded.[3] Further, even though we recognize that the statute is arguably ambiguous when read in isolation, we conclude that the statutory framework and the prior versions of the Tax Exemption Statute resolve this ambiguity and indicate that the Legislature intended that a well "starts" when it is spudded. Accordingly, we affirm the Commission's order granting summary judgment to the Auditing Division of the Utah State Tax Commission (Auditing Division).

## BACKGROUND

¶ 3 This case involves the Horsehead Point natural gas well (Well) in San Juan County, Utah. The Well was spudded on August 28, 1983. On August 16, 1984, the Well was completed and was capable of producing natural gas. It is a "development well" as defined in the Utah Code.[4] As part of the completion process, the Well's former owner conducted a flow test in which natural gas was allowed to flow to measure production. Four days later, on August 20, the Well's former owner "shut in" the Well.[5] It remained shut in until 2006, when Summit acquired an interest in the Well. Because the Well was in a remote location, Summit paid more than $900,000 to construct a pipeline so the Well could begin commercial production. On January 7, 2008, Summit began to commercially produce gas from the Well.

¶ 4 Under section 59–5–102(1)(a) of the Utah Code, Summit is required to pay a severance tax on the gas it produces from the Well. But the Tax Exemption Statute provides an exemption for "the first six months of production for development wells started after January 1, 1990."[6] Citing this statute, Summit claimed a tax exemption for the gas produced during the first six months of 2008. The Auditing Division denied this request, reasoning that the exemption was inapplicable because the Well was spudded before January 1, 1990. The Auditing Division thus required Summit to pay a severance tax on the gas produced from the Well during the first six months of 2008, which amounted to $69,006.42.

¶ 5 Summit then submitted a petition for redetermination to the Commission. The Auditing Division moved for summary judgment, and Summit filed a cross-motion for summary judgment. After a hearing, the Commission granted summary judgment to the Auditing Division and denied Summit's cross-motion. The Commission held that a well starts on the day it is spudded. Specifically, the Commission found that "the drilling, or spudding, of a well must have begun after January 1, 1990 in order for the well to have been 'started after January 1, 1990' and for it to qualify for the exemption." Accordingly, the Commission held that Summit was not entitled to the exemption.

¶ 6 Summit submitted a petition requesting that we review the Commission's order. We have jurisdiction to hear this matter pursuant to section 78A–3–102(3)(e)(ii) of the Utah Code.

---

3. "Spudded" is the "[o]il and gas industry term for commencing to drill." *Hegarty v. Bd. of Oil, Gas, & Mining*, 2002 UT 82, ¶ 10 n. 2, 57 P.3d 1042.

4. *See* UTAH CODE § 59–5–101(5) (" 'Development well' means any oil and gas producing well other than a wildcat well."); *id.* § 59–5–101(28) (" 'Wildcat well' means an oil and gas producing well which is drilled and completed in a pool ... in which a well has not been previously complet-ed as a well capable of producing in commercial quantities.").

5. "A well is shut-in when it is completed and capable of producing natural gas in paying quantities." *Levin v. Maw Oil & Gas, LLC*, 290 Kan. 928, 234 P.3d 805, 816 (2010).

6. UTAH CODE § 59–5–102(5)(c).

## STANDARD OF REVIEW

¶ 7 We review the Commission's statutory interpretations for correctness, granting no deference to its conclusions of law.[7] Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."[8]

## ANALYSIS

¶ 8 The Tax Exemption Statute provides that "[a] tax is not imposed ... upon ... the first six months of production for development wells started after January 1, 1990."[9] Summit asserts that this statute provides a tax exemption for the first six months of a well's production, regardless of when the well was drilled or completed. In other words, Summit argues that a well "starts" only when it begins commercial production. Alternatively, Summit argues that the word "started" modifies "production" rather than "development wells" and concludes that the statute permits an exemption for the first six months of *production* started after January 1, 1990.

¶ 9 The Commission asserts that the statute provides a tax exemption for the first six months of a well's production only if the well was spudded after January 1, 1990. First, the Commission argues that a well "starts" when it is spudded. Second, the Commission argues that the word "started" modifies "development wells" and not "production." We agree with the Commission. As discussed below, when read in isolation, the language at issue is arguably susceptible to two plausible interpretations. But when considered in con-

text, including its prior versions, we conclude that the correct interpretation of the Tax Exemption Statute indicates that a well "starts" when it is spudded.

## I. THE LANGUAGE OF THE TAX EXEMPTION STATUTE INDICATES THAT THE EXEMPTION APPLIES TO WELLS THAT WERE SPUDDED AFTER JANUARY 1, 1990

¶ 10 Although the Tax Exemption Statute is plausibly ambiguous when it is read in isolation, we conclude that the language of the statute suggests that only wells spudded after January 1, 1990, are entitled to the exemption.

¶ 11 When we interpret a statute, "our primary objective is to ascertain the intent of the legislature."[10] Because "[t]he best evidence of the legislature's intent is the plain language of the statute itself,"[11] we first look to the plain language of the statute.[12] But we do not view individual words and subsections in isolation; instead, our statutory interpretation "requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole."[13] We "interpret[ ] statutes to give meaning to all parts, and avoid[ ] rendering portions of the statute superfluous."[14]

¶ 12 We recognize that, when read in isolation, the language of the statute lends itself to two different interpretations.[15] It is possible, as Summit argues, to read the word "started" as modifying "production." Under that reading, the statute would provide a tax

---

7. *ABCO Enters. v. Utah State Tax Comm'n,* 2009 UT 36, ¶ 7, 211 P.3d 382; *ExxonMobil Corp. v. Utah State Tax Comm'n,* 2003 UT 53, ¶ 10, 86 P.3d 706.

8. Utah R. Civ. P. 56(c).

9. Utah Code § 59–5–102(5)(c).

10. *Ivory Homes, Ltd. v. Utah State Tax Comm'n,* 2011 UT 54, ¶ 21, 266 P.3d 751.

11. *Marion Energy, Inc. v. KFJ Ranch P'ship,* 2011 UT 50, ¶ 14, 267 P.3d 863 (internal quotation marks omitted).

12. *Ivory Homes,* 2011 UT 54, ¶ 21, 266 P.3d 751.

13. *Id.* (alteration omitted) (internal quotation marks omitted).

14. *LKL Assocs., Inc. v. Farley,* 2004 UT 51, ¶ 1, 94 P.3d 279.

15. We note that the ordinary and accepted meaning of "start" does not aid our analysis. "Start" is defined in several ways, including "to issue with sudden force." Webster's Ninth New Collegiate Dictionary 1151 (9th ed. 1988). This supports Summit's argument that a well starts when it begins production. But an alternative definition for "start" is "to begin an activity or undertaking." *Id.* This supports the Commission's argument that a well starts when it is spudded.

exemption for the first six months of a development well's production that started after January 1, 1990. The Commission's interpretation, however, is also possible. Under its reading, "started" modifies "development wells," and the statute thus provides an exemption for the first six months of production for development wells that were spudded after January 1, 1990.

¶ 13 But although Summit's reading is plausible, we conclude that the Commission's reading is correct, and that it was the Legislature's intent that a well starts when it is spudded. First, the statute's phrasing draws a distinction between starting a well and starting production. Specifically, the phrase "development wells started after January 1, 1990" seems to describe the particular class of wells that are entitled to the exemption, while the phrase "the first six months of production" seems to describe the period to which the exemption applies. This distinction suggests that the Legislature viewed the start of a well and the start of a well's commercial production as different events.

■ ¶ 14 Second, "[u]nder the rule of the last antecedent, qualifying words and phrases are generally regarded as applying to the immediately preceding words, rather than to more remote ones." [16] Applying this rule, we read "started" to modify the immediately preceding term, which is "development wells." Thus, to be eligible for the tax exemption, it is the well—not production—which must have been started after January 1, 1990.[17] Accordingly, we conclude that the Legislature intended the exemption to apply only to wells that were spudded after January 1, 1990.

## II. THE CONTEXT OF THE TAX EXEMPTION STATUTE AND ITS PRIOR VERSIONS CLARIFY ANY AMBIGUITY AND INDICATE THAT THE LEGISLATURE INTENDED THE EXEMPTION TO APPLY TO WELLS THAT WERE SPUDDED AFTER JANUARY 1, 1990

¶ 15 As discussed above, although the language of the statute suggests that a well must have been spudded after January 1, 1990, to be entitled to the exemption, the statute is arguably ambiguous when read in isolation. Specifically, the alternative interpretation—that a well must have begun *production* after January 1, 1990, to be entitled to the exemption—is at least plausible. But although the language of the statute arguably creates an ambiguity when read in isolation, we conclude that the context of the statute and its prior versions clarify this ambiguity.

¶ 16 First, reading the statute in connection with the other relevant sections of the Utah Code indicates that the Legislature used the word "started" to mean "spudded." In the subsection immediately following the provision for the six-month tax exemption, the statute explicitly allows a tax credit to those who pay to restore a well. Specifically, the Tax Exemption Statute provides that "a working interest owner who pays for all or part of the expenses of a recompletion or workover may claim a nonrefundable tax credit equal to 20% of the amount paid." [18] A recompletion is defined as "any downhole operation that is: (a) conducted to reestablish the producibility or serviceability of a well in any geologic interval; and (b) approved by the division as a recompletion." [19]

---

16. *LPI Servs. v. McGee*, 2009 UT 41, ¶ 15, 215 P.3d 135 (alterations omitted) (internal quotation marks omitted).

17. Further, we note that although we have never considered when a well has "started" under the Tax Exemption Statute, we have equated "started" with "drilled" when referring to the statute. In *Harken Southwest Corp. v. Board of Oil, Gas & Mining*, we considered a prior version of a subsection of the Tax Exemption Statute, which provided an exemption for "wildcat wells" and was nearly identical to the language at issue in this case. 920 P.2d 1176, 1178 (Utah 1996). The

statute provided that "[n]o tax is imposed upon ... the first 12 months of production for wildcat wells *started* after January 1, 1990." Utah Code § 59–5–102(2)(d) (1996) (emphasis added). But in *Harken*, we paraphrased that statute as follows: "Wildcat wells *drilled* after January 1, 1990, are exempt from severance taxes during the first twelve months of production." *Harken*, 920 P.2d at 1178 (emphasis added).

18. Utah Code § 59–5–102(6)(a).

19. *Id.* § 59–5–101(19)(a)–(b).

And a workover is defined as "any downhole operation that is: (i) conducted to sustain, restore, or increase the producibility or serviceability of a well in the geologic intervals in which the well is currently completed; and (ii) approved by the division as a workover." [20]

¶ 17 The fact that the Legislature provided an exemption for wells "started after January 1, 1990," [21] but separately provided a tax credit for those who restore a well's commercial production, is evidence that the Legislature viewed starting a *well* differently from starting a well's *production*. Indeed, recompletions and workovers reestablish or restore a well's commercial production.[22] Thus, if commercial production were the key to determining when a well started, then the Legislature's differentiation between starting a well and undertaking a recompletion or workover would be meaningless. Accordingly, concluding that a well starts only when commercial production begins would "render[ ] portions of the statute superfluous," [23] and we decline to do so. Instead, reading the statute as a whole, we conclude that the Legislature intended that a well starts when it is spudded.

¶ 18 Second, an analysis of the changes the Legislature has made to the Tax Exemption Statute in the more than twenty years since its enaction suggests that the Legislature intended "started" to mean spudded. Prior to 1984, the Utah Code imposed a severance tax on oil and gas produced from a well, but allowed an annual tax exemption on $50,000 of oil or gas produced.[24] In 1985, the statute was amended to provide a six-month tax exemption for new wells.[25] The statute made a clear distinction between "the first day of production" and the day "wells [are] started,"

which indicates that the Legislature considered those to be separate events. The 1985 statute provided as follows:

> An exemption from the payment of occupation tax imposed by this article is allowed for a period of six months following the first day of production. This exemption applies only to wells started after January 1, 1984.[26]

¶ 19 In 1988, the statute was renumbered and reworded. Although the changes to the phrasing were minor, the distinction between the "first day of production" and the date "wells [are] started" was no longer so clear:

> No tax is imposed upon ... the first six months of production for wells started after January 1, 1984.[27]

¶ 20 Then, in 1990, further amendments to the statute for the first time defined and differentiated "wildcat wells" and "development wells," and extended the tax exemption for new wildcat wells to one year.[28] The 1990 version of the statute read as follows:

> No tax is imposed upon: ...
>
> (c) the first six months of production for wells started after January 1, 1984 but before January 1, 1990;
>
> (d) the first 12 months of production for wildcat wells started after January 1, 1990; or
>
> (e) the first six months of production for development wells started after January 1, 1990.[29]

¶ 21 Thus, although the 1990 version increased the duration of the exemption period to one year for some wells—"wildcat wells"—it did so only for wildcat wells "started after January 1, 1990." For wells started before that date, regardless of type, the statute

20. *Id.* § 59–5–101(30)(a)(i)–(ii).

21. *Id.* § 59–5–102(5)(c).

22. *Id.* § 59–5–101(19), (30); *id.* § 59–5–102(6)(a).

23. *See LKL Assocs., Inc. v. Farley,* 2004 UT 51, ¶ 7, 94 P.3d 279 ("This court ... interprets statutes to give meaning to all parts, and avoids rendering portions of the statute superfluous.").

24. Utah Code § 59–5–67(1), (4) (Supp.1983).

25. Utah Code § 59–5–67(6) (Supp.1985).

26. *Id.*

27. Utah Code § 59–5–102(2)(c) (1988).

28. Utah Code § 59–5–101(1), (18) (Supp.1990); *id.* § 59–5–102(d). The 1990 version also included definitions for "workover" and "recompletion" for the first time. *Id.* § 59–5–101(5), (20).

29. *Id.* § 59–5–102(2)(c)–(e).

included a grandfather clause—subsection (c)—which maintained the prior six-month tax exemption for *all* wells started between January 1, 1984, and January 1, 1990.[30]

¶ 22 Although the well at issue in this case is not a wildcat well, the inclusion of the grandfather clause informs our analysis of the Legislature's intent with respect to the statute as a whole. Indeed, the inclusion of the grandfather clause undermines Summit's argument that a well starts when production begins. The grandfather clause is only necessary if a well could have "started" between 1984 and 1990 but, as of January 1, 1990, had been productive for less than six months and thus had not yet received the tax exemption. But if "started" means "started production," then nearly all the wells that started production sometime between 1984 and 1990 would have already received the benefit of the tax exemptions. Specifically, under that reading, as of January 1, 1990, the only wells that could have "started" but not yet received an exemption are those that began production sometime after June 1, 1989. Thus, reading "started" in the 1990 version to mean "started production" renders superfluous the majority of the time period included in the grandfather clause.

¶ 23 Instead, the Legislature's inclusion of the grandfather clause is consistent with an understanding that a well starts when it is spudded. For example, preparatory work for a particular well, including spudding, could have begun sometime between 1984 and 1990, even though production did not begin until after 1990. In this situation, the grandfather clause would have permitted a tax exemption when the well eventually did begin production, but it would have limited that exemption to six months, regardless of the well type. Thus, the inclusion of the grandfather clause suggests that the Legislature understood a well to have "started" when it was spudded. Accordingly, we conclude that the context and prior versions of the Tax Exemption Statute indicate that the Legislature intended that a well starts when it is spudded, and thus resolve any ambiguity in the statute's language.

## CONCLUSION

¶ 24 For the foregoing reasons, we conclude that a well "started" under the Tax Exemption Statute when the well was spudded, regardless of when commercial production began. Thus, the Tax Exemption Statute applies only to wells that were spudded after January 1, 1990. Accordingly, we affirm the Commission's order granting the Division's motion for summary judgment and denying Summit's cross-motion for summary judgment.

Chief Justice DURRANT authored the opinion of the Court, in which Associate Chief Justice NEHRING, Justice DURHAM, Justice PARRISH, and Justice LEE joined.

---

30. By 2008, the grandfather clause was no longer necessary, and it was omitted from the Tax Exemption Statute. *See* UTAH CODE § 59-5-102(5) (2008).