**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ANN CAVLOVIC,

      Plaintiff - Appellee,

v.

J.C. PENNEY CORPORATION, INC.,

      Defendant - Appellant.

No. 17-3174
(D.C. No. 2:17-CV-02042-JAR-TJJ)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **KELLY**, and **BACHARACH**, Circuit Judges.
_____

     Defendant-Appellant J.C. Penney Corporation, Inc. appeals the denial of its

motion to compel arbitration. It filed the motion in the midst of a putative class

action filed by lead Plaintiff-Appellee Ann Cavlovic, alleging that J.C. Penney used

fraudulent advertising practices. The district court denied review of the magistrate

judge's order denying J.C. Penney's motion to compel arbitration, agreeing that J.C.

Penney was not a party to one of the two contracts at issue, and that Cavlovic's

_____

     [*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

allegations fall outside the scope of the other contract. Exercising jurisdiction under 9 U.S.C. § 16[1] and 28 U.S.C. § 1292(a)(1), we AFFIRM.

## I

### A. Allegations set out in Cavlovic's complaint

On December 16, 2016, Cavlovic filed a class action complaint in Kansas state court, alleging J.C. Penney used a "False Former Price Advertising Scheme." App. at 15. J.C. Penney allegedly "would mark up its private-branded and exclusive-branded apparel and accessories by a significant margin and then immediately offer those products at what it represented to be steep discounts." *Id*. Cavlovic sought to represent a group of more than 100 people who, between December 2013 and December 2016, "purchase[d] from [J.C. Penney] in Kansas one or more private and/or exclusive branded items at a discount of at least 30 [percent] off of the state[d] 'original' or 'regular' price, and who have not received a refund or credit for their purchase(s)." *Id*. at 24.

Cavlovic alleged she was part of this class because of a purchase she made on September 23, 2014. On that date, Cavlovic visited a J.C. Penney store in Kansas and purchased 14-carat gold hoop earrings for $171.66. The tag on the earrings

---

[1] This statute states that "[a]n appeal may be taken from . . . an order . . . refusing a stay of any action under section 3 of this title . . . [or] denying a petition under section 4 of this title to order arbitration to proceed." 9 U.S.C. § 16(a)(1)(A)–(B); *see also Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) ("We have jurisdiction under the Federal Arbitration Act, which authorizes an interlocutory appeal of an order 'refusing a stay of any action under section 3 of this title' or 'denying a petition under section 4 of this title to order arbitration to proceed.'" (quoting § 16(a)(1)(A)–(B))).

advertised that the previous price was $524.98, but that J.C. Penney was now selling the earrings for $209.99. J.C. Penney had an additional sale that day, so Cavlovic received an extra 25 percent off the already marked-down price.

Cavlovic paid for the earrings with a credit card that had J.C. Penney's logo on it. GE Money Bank first issued the card to Cavlovic in 2007, with Cavlovic signing a contract to accept the card's terms, and the relationship continued in subsequent years between Cavlovic and the successors to GE Money Bank.[2] In a separate contract—the 2014 Rewards Program agreement—J.C. Penney promised Cavlovic it would issue J.C. Penney Rewards Points for purchases at J.C. Penney using the J.C. Penney-branded card. For instance, Cavlovic earned 158 J.C. Penney Rewards Points for the earrings purchase.

After Cavlovic returned home from the store, she inspected the earrings. For the first time, she noticed the original price tag of $225 on her earrings had been blacked out. After researching the matter, she believed she should have been charged $73.58, instead of $171.66 because her discount should have been pegged to the original price of $225, and not to the advertised inflated price of $524.98. And she believed the price discrepancy was the result of J.C. Penney's False Former Price Advertising Scheme to fraudulently inflate prices.

---

[2] GE Money Bank was the original party to the credit card agreement, and continued the relationship with Cavlovic until September 30, 2011. From October 1, 2011, to June 2, 2014, GE Capital Retail Bank issued the card to Cavlovic. And from June 3, 2014, to the present Synchrony Bank has issued the card to Cavlovic.

In her complaint, she alleges J.C. Penney's purported scheme caused her "emotional distress," *id*. at 22, and the scheme "continues" to the present day, *id*. at 16. Given these factual allegations, Cavlovic—as lead plaintiff of the class—set out three remedies: (1) a finding that J.C. Penney violated the Kansas Consumer Protection Act, Kan. Stat. Ann. §§ 50-623 to 50-643; (2) injunctive and declaratory relief pursuant to the Kansas Consumer Protection Act; and (3) a finding of unjust enrichment.

### B. Procedural posture

J.C. Penney removed the case to the United States District Court for the District of Kansas. It then moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(6). A month later, though, J.C. Penney moved to stay the proceedings and compel arbitration based on two documents: (1) the 2008 credit card agreement between Cavlovic and GE Money Bank for the J.C. Penney-branded credit card; and (2) the 2014 Rewards Program agreement between Cavlovic and J.C. Penney.

The 2008 credit card agreement included the following arbitration provision:

> [A]ny past, present or future legal dispute or claim of any kind, including statutory and common law claims and claims for equitable relief, that **relates in any way** to your account, card or the relationships **that arise from** your account, this agreement or any prior agreement or account, including the enforceability or scope of this provision or disputes or claims that arose before this provision's

4

effective date, ("claim") will be resolved by binding arbitration if you, we[3] or [J.C. Penney] elects to arbitrate.

App. at 57 (capitalization removed; emphases added).

And the 2014 Rewards Program agreement stated:

> This Agreement will be governed by and construed under the substantive laws of the State of Texas, without reference to conflict-of-laws considerations. **[J.C. Penney] and [Cavlovic] each agree that any dispute, claim, or controversy ("Claim") arising from or relating to this Agreement or [Cavlovic's] [J.C. Penney] Rewards Membership will be resolved by binding arbitration conducted in the State of Texas (Collin County)**. [J.C. Penney] and [Cavlovic] each acknowledge and agree that each has chosen arbitration rather than litigation to resolve any such dispute, claim, or controversy. [J.C. Penney] and [Cavlovic] each understand that a judgment on any arbitral award may be entered in any court having jurisdiction. [Cavlovic] will not have the right to participate in a representative capacity or as a member of any class of claimants pertaining to any Claim subject to arbitration. There shall be no right or authority for any Claims to be arbitrated on a class action basis or on any basis involving Claims brought in a purported representative capacity on behalf of the general public or other persons or entities similarly situated.

*Id*. at 73 (emphasis added).

After the magistrate judge stayed the proceedings, Cavlovic responded to the motion to compel. As to the 2008 credit card agreement, Cavlovic argued both that her complaint was outside the scope of that agreement's arbitration clause, and that

---

[3] Elsewhere, the agreement stated, "As used in this provision: 'We,' 'Us,' and 'Our' mean (1) GE Money Bank and all of its parents, subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors (collectively, the 'Bank'), and (2) J. C. Penney Corporation, Inc. and all of its parents, subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors." App. at 57.

5

her agreement was with GE Money Bank (and its successors), not with J.C. Penney. In making these arguments about the J.C. Penney-branded credit card, Cavlovic pointed to the 2016 and 2017 versions of Synchrony Bank's J.C. Penney-branded credit card terms and conditions, and argued that a subsequent contract with terms like the 2016 and 2017 contracts likely superseded the 2008 agreement that J.C. Penney relies on. Nonetheless, in reply to Cavlovic's arguments about the 2016 and 2017 versions of the J.C. Penney-branded card agreement, J.C. Penney renewed its arguments that any contract other than the 2008 credit card agreement was irrelevant.

And as to the J.C. Penney Rewards Program, Cavlovic argued her complaint's allegations about fraudulent advertising fall outside the scope of the arbitration clause in the 2014 Rewards Program agreement.

Despite J.C. Penney's argument that subsequent versions of the J.C. Penney-branded card agreement after 2008 were irrelevant, the magistrate judge set a date to "hear testimony concerning whether any Change in Terms notices and/or amended credit card agreements were sent to Plaintiff other than" the 2008 credit card agreement. *Id*. at 7. Before that hearing, though, J.C. Penney came forward with new evidence. In an affidavit, a representative for the successor to GE Money Bank stated she now believed a 2012 credit card agreement applied—not the 2008 credit card agreement J.C. Penney had previously relied upon. *Id*. at 137–39.

That 2012 credit card agreement had the following critical provision:

6

> If either you or we[4] make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or J. C. Penney Corporation, Inc. **if it relates to your account**, except as noted below. . . .
> We will not require you to arbitrate: (1) any individual case in small claims court or your state's equivalent court, so long as it remains an individual case in that court; or (2) a case we file to collect money you owe us.

*Id*. at 146 (emphasis added).

The magistrate judge then ruled on the motion to compel arbitration. She first concluded the 2012 credit card agreement controls the litigation, and that it is "identical in all respects relevant" to the 2016 credit card agreement. *Id*. at 163. Because J.C. Penney had an opportunity to address why the 2016 credit card agreement compelled arbitration, the magistrate judge believed she could rule on the motion to compel arbitration, even though the parties had not had a full opportunity to address the 2012 agreement.

On the merits of the claims regarding the 2012 credit card agreement, the magistrate judge concluded: (1) the 2012 credit card agreement was narrower in scope than the 2008 credit card agreement; (2) the allegations in Cavlovic's complaint fell outside the scope of the 2012 credit card agreement; and (3) the 2012 credit card agreement did not provide J.C. Penney with the ability to enforce its arbitration provision. Further, the magistrate judge held the allegations in Cavlovic's complaint were outside the scope of the 2014 Rewards Program agreement because Cavlovic's

---

[4] A separate provision in the contract stated, "GE Capital Retail Bank may be referred to as 'we', 'us' or 'our'." App. at 146.

7

"claims are based upon [J.C. Penney's] allegedly deceptive and fraudulent pricing and discounts, not upon breach of the terms of the rewards program or upon [Cavlovic's] membership in the program." *Id*. at 168.

After J.C. Penney objected under Federal Rule of Civil Procedure 72(a), the district court concluded that (1) J.C. Penney "waived the ability to raise new arguments about the appropriate interpretation of the 2012 Agreement" and the 2014 Rewards Program agreement, including any argument about the term "relates" or "relating," *id.* at 210, 212–13; (2) the magistrate judge did not clearly err by looking to the 2008 agreement to aid in interpreting the 2012 agreement, in part because the 2008 agreement was not parol evidence under Utah law; and (3) the magistrate judge did not clearly err in holding that Cavlovic's claims of deceptive advertising fell outside the scope of both the 2012 credit card agreement and the 2014 Rewards Program agreement.

**II**

In this appeal, we must decide whether the district court correctly concluded that J.C. Penney could not compel arbitration under either the 2012 credit card agreement[5] or the 2014 Rewards Program agreement. We review a district court's denial of a motion to compel arbitration de novo. *Ragab v. Howard*, 841 F.3d 1134, 1136 (10th Cir. 2016). To the extent this case involves reviewing factual findings about whether J.C. Penney waived its right to compel arbitration, this court reviews the district court's waiver determination de novo, *In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust*

---

[5] The parties acknowledge the 2012 version is the controlling credit card agreement in this case.

*Litigation*, 790 F.3d 1112, 1115–16 (10th Cir. 2015), but reviews any factual findings about waiver for clear error, *BOSC, Inc. v. Board of County Commissioners*, 853 F.3d 1165, 1169 (10th Cir. 2017).

In analyzing whether J.C. Penney could compel arbitration under either the 2012 credit card agreement or the 2014 Rewards Program agreement, we proceed through two analytical steps. First, for each contract, we determine whether there was an agreement, and whether the agreement provided the moving entity—here, J.C. Penney—with the right to compel arbitration. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017). Second, if the parties had an agreement that provided the moving party with the right to compel arbitration, then we must analyze whether the facts at issue—i.e., the allegations in the complaint—are within the scope of the arbitration agreement. *See Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219−20 (10th Cir. 2002) (stating "the existence of a valid arbitration agreement and the interpretation of a valid arbitration agreement's scope" are "two separate inquiries").

We analyze both the 2012 credit card agreement and the 2014 Rewards Program agreement within this framework, and conclude that J.C. Penney could not compel arbitration under either contract.

## A. J.C. Penney lacked the power to compel arbitration under the 2012 credit card agreement

We begin our inquiry into whether J.C. Penney could force arbitration under the 2012 credit card agreement by analyzing whether J.C. Penney had a right to enforce the provisions of that agreement. *See Jacks*, 856 F.3d at 1304; *Cade v. Zions*

9

*First Nat'l Bank*, 956 P.2d 1073, 1076–77 (Utah Ct. App. 1998) (holding "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" (quoting *AT&T Tech., Inc. v. Communications Workers*, 475 U.S. 643, 648 (1986)). We apply Utah law as the 2012 credit card agreement had a Utah choice of law clause. Upon analyzing the contract, we conclude J.C. Penney had no such right of enforcement under the 2012 credit card agreement.

It is undisputed that J.C. Penney was not a party to that agreement. The contract was only between Cavlovic and GE Capital Retail Bank. Further, the 2012 credit card agreement reads:

> **If either you or we make a demand for arbitration**, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or J. C. Penney Corporation, Inc. if it relates to your account, except as noted below. . . .

App. at 146 (emphasis added). A plain reading of this provision leads us to conclude that arbitration is required if either "you" (Cavlovic) or "we" (GE Capital Retail Bank) demand arbitration. *Id.* Here, neither Cavlovic nor GE Capital Retail Bank— nor its successor, Synchrony Bank—demanded arbitration. Only J.C. Penney demanded arbitration. And the contract, on its face, does not provide for such a third party demand.

J.C. Penney argues the Supreme Court has noted a third party can theoretically enforce an arbitration provision if "a written arbitration provision is made enforceable against (or for the benefit of) a third party under state contract law."

10

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). We therefore must turn to Utah law.

Under Utah law, "only parties to the contract may enforce the rights and obligations created by the contract." *Fericks v. Lucy Ann Soffe Tr.*, 100 P.3d 1200, 1205–06 (Utah 2004) (quoting *Wagner v. Clifton*, 62 P.3d 440, 442 (Utah 2002)). In rare circumstances, a third party can also enforce the contract, but "only if the parties to the contract clearly express an intention 'to confer a separate and distinct benefit' on the third party." *Bybee v. Abdulla*, 189 P.3d 40, 49 (Utah 2008) (quoting *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 506 (Utah 1980)); *see also Hermansen v. Tasulis*, 48 P.3d 235, 239 (Utah 2002) (a third party may enforce a contract provision only if "contracting parties clearly intended" to allow the third party to exercise rights under the contract (quoting *Oxendine v. Overturf*, 973 P.2d 417, 421 (Utah 1999)). But under no circumstances can a party "change or rewrite" the terms of an agreement to broaden the plain language—even in the face of the policy favoring arbitration. *Zions Mgmt. Servs. v. Record*, 305 P.3d 1062, 1071 (Utah 2013) (quoting *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 266 P.3d 751, 755 (Utah 2011)).

Here, the agreement between Cavlovic and GE Capital Money Bank does not evidence a clear intent to provide J.C. Penney—a third party—with the right to demand arbitration under the 2012 credit card agreement. Rather, the intent of the parties is clear from their agreement—only "you" (Cavlovic) or "we" (GE Capital Retail Bank) can demand arbitration of the other. App. at 146. Since there is no indication the parties intended to give J.C. Penney or any other third party the right to

11

demand arbitration, J.C. Penney cannot invoke the arbitration clause of the 2012 credit card agreement. The district court did not err in coming to this same conclusion.

**B. 2014 Rewards Program Agreement**

Unlike the credit card agreement, there is no dispute that J.C. Penney was a party to the 2014 Rewards Program agreement, and has the power to enforce all of its provisions. There is, however, a dispute regarding venue, and whether Cavlovic's allegations are within the scope of the 2014 Rewards Program agreement's arbitration clause. We conclude J.C. Penney waived any argument regarding venue, and that Cavlovic's allegations are outside the scope of the 2014 Rewards Program agreement.

### 1. J.C. Penney waived any objection to having the District of Kansas decide whether to compel arbitration under the 2014 Rewards Program agreement

Before we address the merits of J.C. Penney's arguments regarding whether it could compel arbitration under the 2014 Rewards Program agreement, we must determine whether the District of Kansas was the proper venue for resolving the issue. The 2014 Rewards Program agreement stated that any arbitration must take place in Collin County, Texas. Further, J.C. Penney cites to 9 U.S.C. § 4, which states:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration **may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action** . . . of the

12

subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. **The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed**.

9 U.S.C. § 4 (emphasis added).

In *Ansari v. Qwest Communications Corp.*, 414 F.3d 1214 (10th Cir. 2005), we interpreted § 4 and held "a district court lacks authority to compel arbitration in other districts, or in its own district if another has been specified," *id.* at 1220 (quotation omitted). We further concluded that "[a]ny other result renders meaningless the § 4 mandate that arbitration and the order compelling arbitration issue from the same district." *Id.*

Yet, in *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044 (10th Cir. 2006), we held that the rule announced in *Ansari* is not jurisdictional but "one of venue which the parties . . . waived by not raising the issue before the district court," *id.* at 1051–52; *see also Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1151–52 (10th Cir. 2014) (applying *1mage Software*). That is, we concluded "*Ansari*'s holding that a district court does not have authority to compel arbitration in another district is a statement addressing venue under the" Federal Arbitration Act, and parties to litigation can "waive[] any objection to venue [if] they fail[] to raise the issue in the district court." *1mage Software*, 459 F.3d at 1055.

13

Here, J.C. Penney "disclaimed the forum/venue provisions of its agreement [when it] moved the [District of Kansas] to order arbitration." *Sanchez*, 762 F.3d at 1152. The United States District Court for the District of Kansas therefore had authority to address whether J.C. Penney could compel arbitration under the 2014 Rewards Program agreement.

### 2. Cavlovic's complaint is outside the scope of the 2014 Rewards Program agreement

Having established that the district court had authority to address the 2014 Rewards Program agreement and given that the parties agree J.C. Penney had the power to compel arbitration under the agreement, we next consider whether the district court correctly determined that Cavlovic's complaint fell outside the scope of the 2014 Rewards Program agreement. We agree with the district court's conclusion.

The 2014 Rewards Program agreement covers all claims "arising from or relating to" the Rewards Program. App. at 73. Under the Federal Arbitration Act, we first consider whether this phrase is broad or narrow. Addressing this exact language, this court previously held "arising out of or relating to" is "broad" language. *Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009); *P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999). This creates a presumption in favor of arbitrability. *Sanchez*, 762 F.3d at 1148.

J.C. Penney would have us end our inquiry there, and hold that because the relevant contractual language is broad, any allegation by Cavlovic against J.C.

Penney that even tangentially involves the 2014 Rewards Program agreement must be subject to arbitration. But, because the 2014 Rewards Program agreement had a Texas choice of law clause, we must also consult Texas law. And under Texas law, our inquiry continues beyond an initial determination that the arbitration provision is broad. *See BBVA Compass Inv. Sols., Inc. v. Brooks*, 456 S.W.3d 711, 718 (Tex. App. 2015) (holding that "[w]hether a claim is subject to arbitration turns on its substance"). Though the presumption of arbitrability is a guide, we still must look at the parties' intent. *See Forbau v. Aetna Life Ins. Co*., 876 S.W.2d 132, 133 (Tex. 1994) ("When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent."); *IHS Acquisition No. 171, Inc. v. Beatty-Ortiz*, 387 S.W.3d 799, 806 (Tex. App. 2012) (a determination of whether a party can compel arbitration "requires courts to honor parties' expectations").

And, applying a "plain grammatical meaning" of the contract to the facts of this case, *BBVA Compass*, 456 S.W.3d at 719, it appears the parties did not intend to have facts like those alleged in Cavlovic's complaint to fall within the 2014 Rewards Program agreement's arbitration provision. In "plain language," *IHS Acquisition*, 387 S.W.3d at 809, Cavlovic and J.C. Penney agreed to arbitrate disputes that "aris[e] from or relat[e] to" the Rewards Program. App. at 73. One can imagine many matters that would fall within that category. For instance, the parties likely agreed to arbitrate a disagreement about whether Cavlovic was receiving an adequate number of Rewards Points, or whether J.C. Penney was giving Cavlovic the proper amount of store credit for her Rewards Points.

15

Yet, a plain reading of the arbitration provision does not support the conclusion that Cavlovic and J.C. Penney also agreed to arbitrate disputes about purchases Cavlovic made at J.C. Penney on which she happened to earn J.C. Penney Rewards Points. The complaint's allegations of fraudulent advertising do not "aris[e] from," App. at 73, the Rewards Program or the amount of Rewards Points Cavlovic received for purchases. The complaint's allegations arise from J.C. Penney's alleged practice of falsely inflating their original prices, only to subsequently mark the prices back down to leave an impression of a deep discount.

J.C. Penney argues Cavlovic's purchase of the earrings was "relat[ed] to" the Rewards Program, App. at 73, in that after Cavlovic purchased the earrings, J.C. Penney awarded her 158 Rewards Points. But, as a Texas appellate court determined in declining to compel arbitration, it is difficult to "see that this is a claim 'arising out of or relating to' the contract" because even if the parties "honored their contractual obligations in every respect" under the Rewards Program agreement, the contractual compliance would not affect Cavlovic's allegations. *Fridl v. Cook*, 908 S.W.2d 507, 513 (Tex. App. 1995). In other words, "with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship." *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995) (holding that antitrust claims were outside the scope of an arbitration clause in a licensing agreement).

16

Therefore, the mere existence of the Rewards Program agreement is not itself sufficient to conclude that Cavlovic's allegations of deceptive advertising arise from or relate to that contract.  We conclude the district court did not err.

**III**

We AFFIRM the district court.

Entered for the Court


Mary Beck Briscoe
Circuit Judge