*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 51**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STEWART BECKER,
*Plaintiff and Appellant,*
*v.*
SUNSET CITY,
*Defendant and Appellee.*

No. 20120320
Filed August 13, 2013

On Certiorari to the Utah Court of Appeals

Attorneys:

Jerald D. Conder, Salt Lake City, for petitioner

Gary L. Johnson, Zachary E. Peterson, Kallie A. Smith,
Salt Lake City, Felshaw King, Kaysville, for respondent

JUSTICE DURHAM authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE PARRISH, and JUSTICE LEE joined.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1     The Sunset City Police Department fired Officer Stewart Becker for reporting for duty under the influence of alcohol. The Sunset City Board of Appeals and the Utah Court of Appeals affirmed the termination decision. We granted certiorari on two issues: (1) whether a portable breath test (PBT) result provided sufficient evidentiary support to uphold Sunset City's decision to terminate Mr. Becker and (2) whether Utah Code section 34-38-7 permitted Sunset City to rely on a clause contained in its policy manual that allowed it to depart from the manual's specified procedure of testing urine to establish blood alcohol content.

¶2     We affirm. The Sunset City Board of Appeals properly determined that the PBT result constituted substantial evidence supporting Sunset City's decision to fire Mr. Becker. In addition, Utah Code section 34-38-7 does not prohibit Sunset City from relying on the PBT because this statute does not apply to government employers.

## BACKGROUND

¶3      Mr. Becker was employed as a police officer in the Sunset City Police Department. On April 1, 2007, Mr. Becker finished a shift at 6:00 a.m. and was scheduled to report back for a second shift at 2:00 p.m. that afternoon. When Mr. Becker arrived for work at 2:00 p.m., he discussed the shift change with his supervisor, Sergeant Bruce Arbogast. Sergeant Arbogast immediately noticed a strong odor of alcohol coming from Mr. Becker. Mr. Becker admitted that he had consumed approximately five shots of liquor before going to bed at 8:00 or 9:00 a.m. that morning. Based on his observations and Mr. Becker's statements, Sergeant Arbogast requested that Mr. Becker blow into a PBT. Mr. Becker offered to use his own PBT, telling Sergeant Arbogast that he knew it was "pretty accurate." Mr. Becker blew into the PBT, which registered a breath alcohol content of .045 grams.

¶4      At about the same time, two Utah State troopers arrived to update the clock on an intoxilyzer machine located in Sunset City's police headquarters for daylight savings time. The troopers approached Mr. Becker to discuss his new police vehicle and immediately noticed a strong odor of alcohol coming from him. The troopers expressed their concern to Sergeant Arbogast and said they were considering performing field sobriety tests on Mr. Becker. Sergeant Arbogast told the troopers that he was aware of the situation and that he was taking care of it.

¶5      Mr. Becker asked Sergeant Arbogast not to inform the chief of police, Ken Eborn, about the incident and requested that he be allowed to wait in the office until the alcohol in his system dissipated to the point that he could resume his duties. Sergeant Arbogast declined both requests and called Chief Eborn, who relieved Mr. Becker of duty and scheduled a disciplinary meeting for the following day.

¶6      At the disciplinary meeting, Mr. Becker again admitted to using alcohol before coming to work, increasing his estimated consumption to between six and eight shots of liquor. Mr. Becker stated that he did not dispute the amount of alcohol in his system because his PBT was fairly accurate. Instead he asked for leniency. Chief Eborn, however, determined that the seriousness of the violation warranted termination.

¶7      The department issued a termination letter to Mr. Becker, which stated: "The decision to terminate has been made as a result of you reporting for duty on April 1, 2007 with a Blood Alcohol

Content of .045 in violation of Sunset Police Department Policy and Procedure Manual Section 3-03-02.0, 1-01-04.00 and Sunset City Policy Manual section 4.2.4 (D)." The Sunset Police Department policy manual and Sunset City policy manual referenced in the termination letter (collectively, Alcohol Policy) provide that an officer shall not "report for duty while under the influence of intoxicants." The Alcohol Policy defines "under the influence" to mean "when an employee is affected by drugs or alcohol . . . to the extent that it affects his or her ability to perform their job in a safe manner. An employee . . . whose tests detect[] a Blood Alcohol Content (BAC) of 0.04 or greater, shall be deemed under the influence." The Alcohol Policy also states that being on the job while under the influence of alcohol is a serious offense that will usually result in termination.

¶8     Mr. Becker appealed his termination to the Sunset City Board of Appeals. At the hearing before the board of appeals, Sunset City presented undisputed testimony that the PBT used by Mr. Becker registered a breath alcohol content of .045 grams. One of the state troopers who smelled alcohol on Mr. Becker's breath also testified that she believed it would have been dangerous for Mr. Becker to drive or respond to any calls. The appeals board issued its decision upholding the termination, and the court of appeals affirmed. We granted certiorari on two issues: (1) whether the PBT result provided sufficient evidentiary support to uphold Sunset City's decision to terminate Mr. Becker and (2) whether Utah Code section 34-38-7 permitted Sunset City to rely on a clause contained in its policy manual that allowed it to depart from the manual's specified procedure of testing urine to establish blood alcohol content. We have jurisdiction under Utah Code section 78A-3-102(3)(a).

**STANDARD OF REVIEW**

¶9     In order to arrive at the appropriate standard of review for Mr. Becker's claim that the PBT result was insufficient to support his termination, we must track the standard applied in three successive levels of review. First, on writ of certiorari we review the opinion of the court of appeals for correctness. *Prinsburg State Bank v. Abundo*, 2012 UT 94, ¶ 10, 296 P.3d 709. Second, in determining whether the court of appeals correctly reviewed a lower tribunal's decisions, we assess whether the court of appeals correctly applied the appropriate standard of review. *Jex v. Utah Labor Comm'n*, 2013 UT 40, ¶ 14, __ P.3d __. When reviewing a municipal appeal board's order regarding an employee's termination, the court of appeals is limited

to determining whether the board "abused its discretion or exceeded its authority." UTAH CODE § 10-3-1106(6)(c). Third, in determining whether the municipal appeal board abused its discretion, the court of appeals must decide whether the board correctly applied the standard governing its review of a termination decision, which is "prescribed by the governing body of each municipality by ordinance." *Id.* § 10-3-1106(7)(a). The relevant Sunset City ordinance provides that its "appeals board shall sustain the discharge, suspension or transfer [of a city employee] if it is presented substantial evidence that cause existed for the discharge, suspension or transfer." SUNSET CITY, UTAH, CITY CODE § 1-15-2(C), *available at* http://www.sterlingcodifiers.com/codebook/index.php?book id=575.

¶10   Therefore, we must decide whether the board abused its discretion in concluding that Mr. Becker's termination was supported by substantial evidence. "A decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 11, 266 P.3d 751 (internal quotation marks omitted).

¶11   Mr. Becker's second argument that the court of appeals misconstrued Utah Code section 34-38-7 is a question of statutory interpretation that we review de novo. *See Vorher v. Henriod*, 2013 UT 10, ¶ 6, 297 P.3d 614.

**ANALYSIS**

I. SUBSTANTIAL EVIDENCE SUPPORTS SUNSET CITY'S
DECISION TO TERMINATE MR. BECKER

*A. Due Process Constrains the Reasons for Termination
We May Consider*

¶12   In determining whether substantial evidence supports Sunset City's termination decision, our first task is to establish which reasons for his termination we may properly consider. Sunset City argues that regardless of Mr. Becker's blood alcohol content, evidence that Mr. Becker emitted a strong odor of alcohol independently justified his termination because interactions with the public in this condition would undermine the community's trust and confidence in the police department. While we agree that the potential erosion of public trust occasioned by the odor of alcohol on Mr. Becker's breath may have been a proper basis for disciplinary action, Sunset City did not notify Mr. Becker that this was one of the reasons for his termination. And we may only consider evidence

supporting the reasons for termination stated in the termination letter provided to Mr. Becker in determining whether substantial evidence supports his termination.

¶13    Where state or local law establishes a public employee's right to continued employment absent cause for discharge, that employee holds a property interest in continued employment that is protected by the Due Process Clause of the Fourteenth Amendment. *Goss v. Lopez*, 419 U.S. 565, 573 (1975); *Worrall v. Ogden City Fire Dep't*, 616 P.2d 598, 601 (Utah 1980). Qualified public employees are entitled to the due process protections of notice and an opportunity to be heard regarding the termination of their employment. *Goss*, 419 U.S. at 579.

¶14    Except for several exclusions not applicable here, Utah has granted the procedural protection of a hearing before an appeals board to municipal employees seeking review of the termination of their employment. UTAH CODE §§ 10-3-1105(1)(a), 10-3-1106(2)(a); *Pearson v. S. Jordan Emp. Appeals Bd.*, 2009 UT App 204, ¶ 10, 216 P.3d 996. The statutes governing a municipal employee's appeal from a termination decision, however, do not establish permissible causes for termination, instead allowing each municipality to define cause for an employee's discharge. UTAH CODE § 10-3-1105(4) ("Nothing in this section or Section 10-3-1106 may be construed to limit a municipality's ability to define cause for an employee termination or reduction in force."). Sunset City has adopted an ordinance providing that employees entitled to a post-termination hearing may only be terminated for cause. SUNSET CITY, UTAH, CITY CODE § 1-15-2(C) ("The appeals board shall sustain the discharge, suspension or transfer [of a city employee] if it is presented substantial evidence that *cause existed* for the discharge, suspension or transfer." (emphasis added)). The contours of cause for termination (including for violations of the Alcohol Policy) are defined in Sunset City's policy manuals.

¶15    Because qualified Sunset City employees may only be terminated for cause, they have a due process right to a hearing. This right is defined by Utah Code section 10-3-1106(3)(b)(ii) to entail a post-termination hearing before an appeal board, which shall "receive evidence and fully hear and determine the matter *which relates to the reason for the discharge*." UTAH CODE § 10-3-1106(3)(b)(ii) (emphasis added). Consequently, protected municipal employees also have a due process right to adequate notice of the reasons for their discharge so that they can meaningfully prepare for and participate in the municipal appeal board hearing. *Fierro v. Park City*

*Mun. Corp.*, 2012 UT App 304, ¶¶ 18–19, 295 P.3d 696. Thus, the appeal board may consider only evidence related to the grounds for discharge for which the employee has received proper notice, usually in the form of a termination letter or similar memorandum. *Id.* ¶¶ 21–22. We may not side-step this due process limitation in determining whether a municipal appeal board's decision is supported by substantial evidence.

¶16     Here, Sunset City issued a termination letter to Mr. Becker, notifying him that "[t]he decision to terminate has been made as a result of you reporting for duty on April 1, 2007 with a Blood Alcohol Content of .045 in violation of [Sunset City's Alcohol Policy]." In other words, the termination letter notified Mr. Becker he was being fired due to his blood alcohol level when he arrived at work, which indicated his ability to perform his duties had been impaired.  While the potential erosion of public trust caused by the smell of alcohol on his breath is certainly related to Mr. Becker's blood alcohol level, the termination letter did not adequately notify him that this was one of the reasons for his termination. We therefore limit our review to a determination of whether substantial evidence supports the conclusion that Mr. Becker's blood alcohol content violated Sunset City's Alcohol Policy.

*B. Substantial Evidence Supports the Conclusion that Mr. Becker
Was "Under the Influence" of Alcohol, in Violation of the
Sunset City's Alcohol Policy*

¶17     Mr. Becker alleges the PBT result is inadequate to support his termination because PBTs do not directly measure blood alcohol content. We find, however, that the PBT reading constitutes substantial evidence that Mr. Becker's blood alcohol content was high enough to justify his termination under Sunset City's policies.

¶18     Sunset City's Alcohol Policy allows for the termination of a police officer for reporting for duty while "under the influence" of alcohol. It further provides that the principal criterion for determining when an officer is "under the influence" is whether the officer "is affected by drugs or alcohol . . . to the extent that it affects his or her ability to perform their job in a safe manner." The Alcohol Policy states that an officer "whose tests detect[] a Blood Alcohol Content (BAC) of 0.04 or greater, shall be deemed under the influence." Thus, while a test indicating a blood alcohol content of .04 grams or greater conclusively establishes that an individual is under the influence of alcohol, it is not the only potentially relevant evidence. Other evidence that an officer's ability to safely perform

job duties is adversely affected by alcohol could also be grounds for termination.

¶19 Sunset City proffered evidence that Mr. Becker was under the influence of alcohol through undisputed testimony that the PBT registered Mr. Becker's breath alcohol content to be .045 grams and through evidence that the PBT reading was accurate. Trooper McLaughlin testified that PBTs are accurate instruments and that they typically generate a reading one or two thousandths lower than an intoxilyzer—a larger instrument that tests breath alcohol levels and prints the result. The appeals board also heard evidence that the particular PBT used by Mr. Becker had been scientifically tested and shown to be accurate. When Mr. Becker was terminated, the PBT was taken out of service and stored under lock and key. The PBT was tested on three separate occasions using a certified solution with a known alcohol concentration. On each occasion, technicians reported that the PBT was "very accurate" or "dead on." Moreover, Mr. Becker chose the PBT he wished to use, stating that he knew that his PBT was "pretty accurate."

¶20 Sunset City also produced evidence that although a PBT directly measures breath alcohol content, it also accurately indicates an individual's blood alcohol content.[1] A breath alcohol test, such as a PBT, "measure[s] a person's blood alcohol content from a sample of the person's breath." BLACK'S LAW DICTIONARY 215 (9th ed. 2009) (defining "breathalyzer"). Utah's DUI statutes recognize the close correspondence between breath alcohol and blood alcohol tests by criminalizing the operation of a vehicle with a "blood or breath alcohol concentration of .08 grams or greater."[2] UTAH CODE § 41-6a-502(1)(a). During the hearing before the appeals board, Sunset City provided evidence that a PBT accurately indicates an individual's blood alcohol level through the testimony of Trooper McLaughlin, who had been a highway patrol officer for almost ten years and had

---

[1] *Cf. State v. Manwaring*, 2011 UT App 443, ¶ 28, 268 P.3d 201 (noting that a PBT and subsequent blood tests on an individual yielded nearly identical readings).

[2] Although breath alcohol and blood alcohol are both measured in grams, blood tests and breath tests gauge the amount of alcohol contained in different volumes so that the two tests produce similar results: "Alcohol concentration in the blood shall be based upon grams of alcohol per 100 milliliters of blood, and alcohol concentration in the breath shall be based upon grams of alcohol per 210 liters of breath." UTAH CODE § 41-6a-502(2).

received specialized training regarding breathalyzers and PBTs. Trooper McLaughlin testified that, in fact, PBTs generally produce a slightly lower alcohol content reading than a blood test.

¶21    We find this evidence to be substantial because it constitutes "a quantum and quality of relevant evidence that is adequate to convince a reasonable mind" that Mr. Becker reported for duty with a blood alcohol content of .04 grams or greater. *See Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 11, 266 P.3d 751 (internal quotation marks omitted). "Substantial evidence is more than a mere 'scintilla' of evidence and something less than the weight of the evidence." *Johnson v. Bd. of Review of Indus. Comm'n*, 842 P.2d 910, 911 (Utah Ct. App. 1992). In conducting a substantial evidence review, we do not "reweigh the evidence" and independently choose which inferences we find to be the most reasonable. *Utah Ass'n of Cntys. v. Tax Comm'n ex rel. Am. Tel. & Tel. Co.*, 895 P.2d 819, 821 (Utah 1995). "Instead, we defer to [a lower tribunal's] findings because when reasonably conflicting views arise, it is the [fact-finder's] province to draw inferences and resolve these conflicts." *Id.*

¶22    Although a reasonable fact-finder could potentially conclude that Mr. Becker's blood alcohol content was not .04 grams or greater because the PBT reading of .045 grams was close to this threshold or because PBTs do not directly test blood alcohol content, this is not the only reasonable conclusion that could be drawn from the evidence. Evidence that the PBT was accurate and that PBTs tend to produce a slightly lower reading than a blood alcohol test was sufficient to support a conclusion that Mr. Becker's blood alcohol content was high enough that he was "under the influence" as defined in Sunset City's policies. The appeal board properly determined that substantial evidence supported Mr. Becker's termination, and we may not disturb this conclusion.[3]

## II. UTAH CODE SECTION 34-38-7 DOES NOT PROHIBIT SUNSET CITY FROM DEVIATING FROM ITS URINE TESTING POLICY

¶23    Sunset City's policy manual provides that "Drug/Alcohol Testing is an analysis of a urine specimen provided by the

---

[3]    Our holding, of course, is limited to the application of the substantial evidence standard of review to the specific evidence presented in this case. We make no broad pronouncements regarding the use of PBT evidence in criminal cases or civil cases involving a different standard of review or different evidence.

employee." The manual also indicates, however, that Sunset City may deviate from its policies when circumstances require it to do so: "The procedures set out below are as complete as Sunset City can reasonably make them. However, they are not necessarily all inclusive. Sunset City Corporation may vary from the rules/procedures listed if, in its opinion, the circumstances require." Sunset City asserts that it did not conduct a urine test because Mr. Becker was the only officer scheduled to work on the afternoon that he reported for duty while under the influence of alcohol, and Sergeant Arbogast needed to cover Mr. Becker's shift until a replacement could be found. According to Sunset City, these circumstances required it to deviate from its urine testing procedure because if Sergeant Arbogast had taken the time to drive Mr. Becker to the hospital to conduct a urine test, the city would have been left without any police coverage.

¶24　Mr. Becker contends that Utah Code section 34-38-7 prohibited Sunset City from deviating from its policy manual's urine testing policy. Under section 34-38-7(1), "[t]esting or retesting for the presence of drugs or alcohol by an employer shall be carried out within the terms of a written policy."

¶25　A review of the definitions applicable to section 34-38-7 reveals, however, that this statute does not apply to Sunset City. Utah Code section 34-38-2 provides: "For purposes of this chapter [including section 34-38-7] . . . 'Employer' does not include the federal or state government, or other local political subdivisions." As a local political subdivision of the state, Sunset City is exempt from the requirements imposed by section 34-38-7.

## CONCLUSION

¶26　Because substantial evidence supports Mr. Becker's termination, and because Utah Code section 34-38-7 does not apply to Sunset City, we affirm.

————