2023 UT App 96

# THE UTAH COURT OF APPEALS

ELIZABETH A. HOFFMAN,
Petitioner,

*v.*

LABOR COMMISSION, DELTA AIR LINES, NORTH RIVER INSURANCE
COMPANY, AND HARTFORD INSURANCE COMPANY,
Respondents.

Opinion
No. 20200184-CA
Filed August 24, 2023

Original Proceeding in this Court

David J. Holdsworth, Attorney for Petitioner

Christin Bechmann and Rachel Konishi, Attorneys for
Respondents Delta Air Lines, North River Insurance
Company, and Hartford Insurance
Company

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

MORTENSEN, Judge:

¶1     Elizabeth A. Hoffman suffered a work-related injury that
resulted in multiple surgeries and chronic pain. Her doctors
prescribed her opioids and other medications. For many years,
Delta Air Lines (Delta) and its insurance carrier, Hartford
Insurance Company (Hartford; collectively, Respondents), paid
for these medications. But after a doctor hired by Hartford
performed a medical examination of Hoffman (an insurance
"defense exam") and recommended weaning with professional
assistance, Respondents stopped paying for Hoffman's
medications altogether and made no provision for weaning.

Hoffman initiated a formal adjudicative proceeding against Respondents through the Utah Labor Commission (the Commission), and a medical panel opined that a level of opioid use lower than Hoffman had previously taken was historically necessary. Regarding future expenses, the panel indicated that Hoffman should undergo a formal weaning program to stop using opioids or else reduce her opioid use to a certain lower level.

¶2 An administrative law judge (ALJ) ordered that Respondents reimburse Hoffman for past expenses and follow the panel's recommendations in providing a weaning program and covering the cost of the panel's recommended lower opioid dosage if complete weaning was unsuccessful. Upon review, the Appeals Board of the Utah Labor Commission (the Board) interpreted the ALJ's decision as covering the lower opioid dosage in the future without waiting for a weaning opportunity to trigger the reduced coverage, though it indicated that Respondents would be liable for the costs of a weaning program if Hoffman elected to participate in one. It also modified the order as to past expenses to cover only the dosages of opioids the panel had indicated were "necessary." Hoffman now seeks judicial review of the Board's decision. We conclude that the Board's decision concerning the compensability of Hoffman's past and future expenses for medications is supported by the medical panel's report and is therefore supported by substantial evidence. Accordingly, we decline to disturb its decision.

BACKGROUND

¶3 Hoffman sustained a work-related traumatic back injury in 1986 while working for Western Airlines, which later merged with Delta. For some thirty years, Hartford paid for Hoffman's industrial medical expenses and prescription medications. During that time, Hoffman underwent five back surgeries. After the last surgery in 2002, she had to stop working due to

debilitating chronic back pain and pain in her right leg. Her physicians prescribed opioid pain medication to treat her pain, and she has taken these without cessation—though in varying amounts—since 2002. Her doctors also prescribed benzodiazepines, to treat the anxiety that Hoffman developed after the injury, and Soma, a muscle relaxant.

¶4 In 2006, the parties entered into a stipulated settlement wherein Hartford agreed "to continue paying reasonable medical expenses related to the accepted injuries."

¶5 In January 2016, Hartford required Hoffman to undergo a defense exam with Dr. Deborah Mattingly. In short, Dr. Mattingly recommended that Hoffman be weaned from her medications under the supervision of a specialist. Soon thereafter, Hartford stopped paying Hoffman's medical and prescription expenses. Initially, Hoffman's private medical insurance paid for her medications, but when it too stopped, she began paying for them out of pocket.

¶6 Hoffman initiated a formal adjudicative proceeding against Respondents. The ALJ first assigned to the case, Judge Colleen Trayner, identified that the "only issues before the Court [were] necessary medical care from 2016 to the present and recommended medical care to treat [Hoffman's] industrial . . . condition." Utah law dictates that an injured employee's "employer or the [employer's] insurance carrier shall pay reasonable sums for medical, nurse, and hospital services [and] for medicines . . . necessary to treat the injured employee." Utah Code § 34A-2-418(1).

*Judge Trayner's Findings*

¶7 Judge Trayner entered the following findings of fact:

On January 12, 2016, [Hoffman] underwent [a defense exam] with Dr. Mattingly. Dr. Mattingly opined that the only recommended treatment is to wean [Hoffman] from her opioids, benzodiazepines[,] and Soma. Dr. Mattingly opined that [Hoffman] requires a weaning from the opiates under the supervision of an addiction or pain specialist. This should not take more than six months. Dr. Mattingly also recommends a regular exercise program.

On March 29, 2016, Catherine Harmston, FNP, filled out a Summary of Medical Evidence. . . . Catherine Harmston opined that [Hoffman's] lumbar spine surgeries and opioid analgesics were necessary to treat [Hoffman's] 1986 industrial injuries. Catherine Harmston recommends physical therapy, consult with Dr. Nelson[,] and monthly medication.

On January 15, 2018, Dr. Stoddard filled out a Summary of Medical Evidence. Dr. Stoddard opined that [Hoffman's] opioid treatment was necessary to treat her 1986 industrial injuries. Dr. Stoddard recommends ongoing opioid treatment.

On January 29, 2018, Dr. Stoddard prescribed [Hoffman] a [Bowflex] machine, therapeutic hot tub[,] and housecleaning services every other week as a result of [Hoffman's] chronic back pain.

[Hoffman] underwent [a defense exam] with Dr. Jiricko on October 9, 2018. On December 14, 2018, Dr. Jiricko provided an addendum. Dr. Jiricko opined that he does not recommend a spinal cord stimulator or surgical intervention. Dr. Jiricko recommends weaning from the opioid medication.

> Dr. Jiricko notes that [Hoffman] requires a formal inpatient detoxification and/or a 4-week [structured intensive multidisciplinary program]. . . . [Hoffman] requires a consultation with an addiction specialist or psychiatrist. Dr. Jiricko recommends a robust cognitive behavioral therapy training . . . and psychiatric evaluation for anxiety and medication management. Also, 10 to 12 sessions of physical therapy for [Hoffman's] right leg.
>
> [Hoffman was] treated [by] Dr. Anden from November 1, 2018[,] through January 9, 2019. . . . Dr. Anden's last medical care recommendation [was] to continue [the] same medications [and] independent home/gym exercise program[,] which includes walking, back stretches, core strengthening, and weight management. . . .

(Internal citations omitted.)

¶8 Judge Trayner then concluded that "[t]here is a dispute among physicians regarding medical care after 2016 and recommended medical care to treat [Hoffman's] back condition." Accordingly, she ordered "that the issues of medical and recommended medical care shall be referred to a medical panel for consideration." *See* Utah Admin. Code R602-2-2(A) ("A panel will be utilized by the Administrative Law Judge where one or more significant medical issues may be involved.").

### The Medical Panel's Report

¶9 The medical panel's report, issued in July 2019, stated the following regarding past medical care:

Q: Please past medical care since 2016 been necessary to treat [Hoffman's] 1986 industrial back injury?[1]

A: The term "necessary" is . . . difficult to answer[,] especially in the setting of chronic pain. It is not considered medically necessary for her to continue with her opioids, benzodiazepine[,] and Soma because without those medications she would not die[,] and in reality, the use of these medications greatly increases her risk of death. However, her pain and anxiety would increase. From 2002–2016, she used excessive amounts of opioids at 440 mg of oxycodone[,] and to take away all the opioids quickly would be inhumane[,] and weaning would be mentally and physically challenging. We have had a difficult time deciding what is considered "necessary" in trying to balance humane treatment given her 14 years of continuous excessive opioid use with current medical standards for chronic pain and the risks and benefits of the opioids, benzodiazepine[,] and Soma.

We have decided that [Hoffman] "needed" the 120 mg of OxyContin (extended release oxycodone) a day. This amount is still over what is recommended by CDC and ACOEM guidelines for

---

1. We recognize that the medical panel's report phrased this question confusingly. Judge Trayner's memo to the medical panel asked, "What past medical care since 2016 been [sic] necessary to treat the Petitioner's 1986 industrial back injury?" The panel's wording further muddies already murky waters. But regardless of the wording, the panel understood that it was asked to determine what past care was necessary between 2016 and the time of the panel's analysis.

treatment of chronic pain[,] but it is improved from the 270 mg of oxycodone she is currently using.

We believe the benzodiazepine and Soma are clearly not medically necessary and are not indicated to treat chronic pain. The oxycodone 30 mg 5X/day is excessive and not medically indicated. There is no objective or subjective evidence that these medications ever improved her pain score or improved her function. In fact, her pain score and function are unchanged from the 440 mg of daily oxycodone use compared to the 270 mg of daily oxycodone she currently uses.

¶10 The medical panel said the following regarding future medical care:

Q: What medical care, if any, is recommended to treat [Hoffman's] 1986 industrial back medical condition, including but not limited to medications, spinal cord stimulator, [Bowflex] machine, housecleaning and therapeutic hot tub?

A: We believe that Dr. Jiricko's plan is the most ideal. However, [Hoffman] has both psychologic and physical dependence o[n] the opioids (this is different [from] an opioid use disorder or opioid addiction)[,] and she is very anxious about not taking her medications. She is not psychologically ready to stop taking opioids[,] and having her go to treatment for the opioid dependence would not be successful until she *wants* to get off opioids. If she is unwilling to wean off her opioids, these are our recommendations:

1. Wean down to 180 mg of morphine equivalent dose a day (which is 90–120 mg

oxycodone per day depending on [the] conversion ratio chosen). This can be a variation of OxyContin only, oxycodone only[,] or a combination of OxyContin and oxycodone.

Or

2. Switch to Buprenorphine 16 mg or less a day.

Regardless of which path she and her physician decide, she needs to stop using the benzodiazepine and Soma along with her opioid. There are better medications to treat her anxiety and sleep disorder with less risk profile. She would benefit from a [p]sychiatry evaluation to treat her anxiety from the chronic pain and [a] [s]leep specialist evaluation to treat her sleep disorder from chronic pain.

We do not believe she would benefit from the spinal cord stimulator to improve function or reduce medication. . . .

We do not believe a [Bowflex] machine is medically indicated. Exercise is indicated and recommended, but virtually all forms of exercise are helpful (walking, swimming, core strength, yoga, etc.), but a specific brand name device is not needed.

We do not believe she would benefit from a hot tub. There is no scientific evidence to suggest hot tubs improve function or help chronic low back pain.

We do not believe housekeeping is medically necessary for her low back pain. She currently

chooses to employ housekeeping services, but her current yard and animal care have similar physical requirements. Having housekeeping has not improved her function[,] nor has it allowed her to reduce her opioid use.

¶11 Hoffman filed a response containing multiple objections to the medical panel's report. Respondents filed a response in support of the medical panel's report. Meanwhile, the case was transferred to another ALJ, Judge Steven J. Rammell.

*Judge Rammell's Order*

¶12 Judge Rammell issued findings of fact, conclusions of law, and an order in October 2019, wherein he found "that the [medical panel report] is the product of thorough, collegial, and impartial review, both of the entire medical record and of [Hoffman] herself," and that the medical panel was "qualified to opine on [Hoffman's] historical and future medical treatment." Accordingly, Judge Rammell "adopt[ed] and admit[ted] into evidence the [m]edical [p]anel [r]eport and conclude[d] that the panel's findings [were] reliable and its treatment recommendations appropriate."

¶13 Regarding future expenses, Judge Rammell ruled that Respondents are "obligated to pay for the expenses associated with the recommended future treatment" according to "the medical panel's recommendations, both as they mirror those of Dr. Jiricko and the two proposed alternative options should [Hoffman] prove unwilling or unable to wean off her opioids."

¶14 On the topic of past expenses, Judge Rammell grappled with the "rather unique issue" of "whether a carrier is obligated to pay for past medical expenses that have since been found unnecessary" based on the "medical panel's conclusions that the benzodiazepine, Soma, and the previous dosages of opioids were

not medically necessary." On this question, Judge Rammell stated that "the appropriate course and timeframe for treatment of a petitioner's industrial injuries may be determined by the petitioner's treating physicians, but a respondent's liability for such treatment does not extend beyond the care recommended in an adopted medical panel report." However, Judge Rammell determined that "[Hoffman] properly relied on her treating physician's recommendations at the time" and "[a] medical panel's later conclusions of excessive dosage should not be retroactively applied to punish [Hoffman] for following her physician's advice prior to the panel's involvement."[2]

---

2. In reaching this conclusion, Judge Rammell relied on two previous decisions by the Board: *Pakalani-Raber v. Convergys Corp.*, No. 16-0316, 2017 WL 6818274, at *3 (Utah Labor Comm'n Dec. 5, 2017) (determining that a petitioner "properly relied on her treating physician's recommendations regarding opioid pain medication as awarded to her through the adjudication of her previous claim" and concluding that "[t]o deny a claim for medical benefits that were deemed necessary by a medical panel in the previous case after the fact would not be appropriate"), and *Tacy v. Kennecott*, No. 15-0370, 2018 WL 6018509, at *1–2 (Utah Labor Comm'n Sept. 11, 2018) (reciting how, after a medical panel modified its earlier opinion to no longer recommend a benzodiazepine and to recommend a lower dosage of opioid use or complete weaning, an ALJ "relied on the panel's clarified opinion and awarded [the petitioner] the past expenses for opioid and benzodiazepine medications along with the cost of a program to wean him from such medications"). Judge Rammell acknowledged that the decisions were not on all fours with Hoffman's case but stated that "the underlying principle[s]" of the decisions "remain[] applicable" such that "[a] medical panel's later conclusions of excessive dosage should not be retroactively

(continued…)

¶15    Judge Rammell then reached the following conclusions:

> Here, a preponderance of the evidence demonstrates that when [Hoffman] began taking this combination of medications for which she now seeks reimbursement, ". . . high dose opioid prescriptions for chronic pain was the standard of care" along with concurrent benzodiazepine use. In contrast, only Dr. Stoddard has indicated that a [Bowflex] machine is medically necessary for [Hoffman], while Dr. Mattingly, Dr. Anden, and the medical panel simply agree that regular exercise would be beneficial to [Hoffman]. As such, the Court finds that a preponderance of the evidence demonstrates the potential benefits to [Hoffman] of regular exercise, but there is no such preponderance regarding the medical necessity of a [Bowflex] machine specifically. Similarly, there is no preponderance of evidence to support the medical necessity of a spinal cord stimulator, hot tub, or housekeeping service. . . . [B]ecause those courses of treatment were not recommended by the medical panel, and without an independent preponderance of the evidence to support them, the Court does not

---

applied to punish [Hoffman] for following her physician's advice prior to the panel's involvement." We observe that the fact of a previous medical panel report in both decisions is critical. Here Hoffman's past opioid use above the level the medical panel deemed "necessary" was *not* based on a previous recommendation by a medical panel. In Judge Rammell's words, "[A] respondent's liability for . . . treatment does not extend beyond the care recommended in an adopted medical panel report." Here, Respondents' liability for Hoffman's past medical care does not extend beyond the medical panel's determination as to which portion of that care was necessary.

find these treatments "necessary" and Respondent[s] [are] not liable to cover those expenses.

The Court therefore finds that [Hoffman] is entitled to reimbursement for her out-of-pocket expenses for the historical use of the previously-recommended medications.

¶16 Hoffman then filed a "[m]otion for [r]eview as to certain selected aspects" of Judge Rammell's decision. Hoffman claimed that the medical panel's "conclusion as to the reasonableness or necessity of [her] past use of [o]xycodone is somewhat unclear, but given the Court's decision, Ms. Hoffman asserts her historical use of [o]xycodone should also be deemed compensable." She also stated, "Presumably, until Hartford indicates a willingness to implement Dr. Jiricko's and the panel's recommendations (which the Court adopted), Ms. Hoffman's continuing use of [OxyContin] should be compensable." She thus requested that the Board "clarify the compensability as to the continuing use of [OxyContin] and doctors' appointments related thereto."

*The Board's Order*

¶17 In February 2020, the Board issued an order modifying Judge Rammell's decision. In it, the Board stated the following:

Ms. Hoffman contends that Judge Rammell's order should be clarified to award her the cost of the medication she is currently prescribed until the point Delta is willing to pay for the program and the other treatment described by the panel to wean her from her dependence on opioids. After reviewing Judge Rammell's decision in light of the medical evidence, the [Board] agrees with Ms. Hoffman that the order and award of benefits is lacking in enough

specificity to allow reasonable reliance upon the order by the parties. . . . It appears that Judge Rammell's award of benefits to Ms. Hoffman is based on the medical panel's recommendations even if he did not specify the treatment outlined by the panel in the order.

The [Board] reads the panel's conclusion on the issue of future medical care as providing two alternatives: first, the recommended weaning from opioids; and second, the 180 mg of morphine equivalent or 16 mg or less of buprenorphine per day. The [Board] views the reason for alternatives to be unimportant. Whether Ms. Hoffman hesitates to begin the weaning program or whether Delta somehow delays authorization for such program, the panel outlined the necessary pain medication for her work-related low-back condition.

With respect to Ms. Hoffman's past medical expenses—specifically the cost of her medication prescribed by her treating physicians—the [Board] finds that Delta is only liable for the amount determined to be "necessary" by the medical panel: 120 mg of extended release oxycodone without the benzodiazepine and Soma. The cases discussed by Judge Rammell involve circumstances that are distinct from the relatively simple issue in the present matter. As the parties acknowledge in their motions, Delta may stop payment for medical treatment upon the recommendation from Dr. Mattingly and assume the risk of liability if such treatment is ultimately found to be necessary and appropriate through adjudication before the Commission. In Ms. Hoffman's case, that appears to be what took place with the exception that the panel

> determined less medication was necessary than what had been prescribed by her treating physicians. The panel's opinion regarding necessary medical treatment is persuasive as it represents a thorough and well-reasoned assessment of Ms. Hoffman's condition and because it is the product of collegial, impartial, and expert review of all of her relevant medical history. Thus, Ms. Hoffman is only entitled to the cost of past medical expenses consistent with the panel's conclusions regarding what was necessary on an industrial basis.

(Internal footnote omitted.) In its order, the Board said,

> The [Board] modifies the portion of Judge Rammell's order . . . related to past medical expenses by awarding Ms. Hoffman only the cost of medical care determined to be necessary by the medical panel in this case. This includes the cost of the medication found necessary by the panel unless or until Ms. Hoffman undergoes the detoxification program and accompanying therapy outlined by the panel and Dr. Jiricko. Delta is liable for the cost of such treatment . . . .

¶18 Hoffman now seeks judicial review of the Board's decision.

ISSUES AND STANDARDS OF REVIEW

¶19 Hoffman asks us to determine whether the Board's findings of facts and conclusions of law with regard to her past and future medical expenses were supported by substantial evidence.

¶20 Utah law permits appellate courts to grant relief when a party is "substantially prejudiced" by an error in the "final agency

action resulting from formal adjudicative proceedings." Utah Code § 63G-4-403(1), (4). Our supreme court has explained that the applicable statute "lists several categories of remediable errors and implies a standard of review for some, but not all, of these errors." *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242. For example, "a challenge to an administrative agency's finding of fact is reviewed for substantial evidence." *Id.*; *see* Utah Code § 63G-4-403(4)(g). But if substantial prejudice occurs because "the agency has erroneously interpreted or applied the law," Utah Code § 63G-4-403(4)(d), "we employ one of our established standards of review for mixed questions of law and fact," and "[t]he level of deference we afford to an agency's resolution of mixed questions varies depending upon the nature of the mixed question under review," *Provo City*, 2015 UT 32, ¶ 9. Here, Hoffman alleges that "the particular conclusions at issue are more 'factual' than 'legal' and, thus, should be reviewed under the substantial evidence test."

¶21    "A decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Becker v. Sunset City*, 2013 UT 51, ¶ 10, 309 P.3d 223 (cleaned up). "In conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable." *Id.* ¶ 21 (cleaned up). "Instead, we defer to [an administrative agency's] findings because when reasonably conflicting views arise, it is the [agency's] province to draw inferences and resolve these conflicts." *Id.* (cleaned up).

## ANALYSIS

¶22    Hoffman asks us to review the Board's order. She says she "believes some of the [Board's] decision[s] and conclusions are sound, but she also asserts some of the [Board's] decisions and conclusions are questionable and erroneous."

¶23    First, Hoffman argues that the medical panel's determinations as to past and future treatment are problematic because the panelists are not her treating physicians. Concerning past expenses, Hoffman "asserts her treating physicians were historically in the best position to make . . . judgment calls" about "what kind of opioid pain medication and how much" was appropriate for her "as they worked with Ms. Hoffman to get her type and levels of prescription opioid pain medication properly calibrated so she could function on a limited but stable basis." Regarding future treatment, Hoffman argues that a "medical panel's recommendations become problematic because members of a panel are not the treating physicians and do not have any history with the claimant and are not able to follow the claimant's response to any particular treatment." Hoffman asserts that a "treating physician is in the best position to make and implement and monitor recommended future treatment."

¶24    But the role of a medical panel is well settled by statute and caselaw. Utah Code section 34A-2-601 establishes that "[a]n administrative law judge may base the administrative law judge's finding and decision on the report of . . . a medical panel." Utah Code § 34A-2-601(2)(e)(i). Even if treating physicians are best positioned to prescribe and adjust a treatment plan, this reality would not render a medical panel's conclusions and recommendations legally impotent. Indeed, we have "note[d] that a medical panel's report alone can be enough to conclude that the Commission's determination was supported by substantial evidence." *Morris v. Labor Comm'n*, 2021 UT App 131, ¶ 17, 503 P.3d 519 (cleaned up), *cert. denied*, 509 P.3d 768 (Utah 2022). "After all, the [applicable statute] expressly permits the Commission to base its findings on a medical panel's report, and we will not question the Commission's decision to do so where, as here, the reports are thorough and prepared by neutral medical experts." *Id.* (cleaned up).

¶25 Hoffman does not assert that the panel's report was not thorough or that it was not prepared by "neutral medical experts." *Id.* She does not take issue with the Board's or Judge Rammell's findings about the reliability of the panel's report. The Board indicated that "[t]he panel's opinion regarding necessary medical treatment is persuasive as it represents a thorough and well-reasoned assessment of Ms. Hoffman's condition and because it is the product of collegial, impartial, and expert review of all of her relevant medical history." And Judge Rammell declared that "the [medical panel report] is the product of thorough, collegial, and impartial review, both of the entire medical record and of [Hoffman] herself" and "that the panel's findings [were] reliable and its treatment recommendations appropriate." We have no reason to disregard the panel's recommendations. "Accordingly, if the Commission's decision is supported by the medical panel reports, the substantial evidence standard is satisfied." *Id.*; *see also Valdez v. Labor Comm'n*, 2017 UT App 64, ¶ 22, 397 P.3d 753, *cert. denied*, 400 P.3d 1046 (Utah 2017); *Hutchings v. Labor Comm'n*, 2016 UT App 160, ¶ 32, 378 P.3d 1273, *cert. denied*, 390 P.3d 720 (Utah 2017); *Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 18, 317 P.3d 464. Again, "in conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable." *Becker v. Sunset City*, 2013 UT 51, ¶ 21, 309 P.3d 223 (cleaned up). Therefore, we reject Hoffman's arguments that the medical panel's determinations regarding past and future treatment are problematic merely because the panelists are not her treating physicians.[3]

---

3. Hoffman also takes issue with statements in the medical panel's report concerning the medical or clinical findings that supported the panel's assessment. She argues that the medical panel's

(continued…)

¶26    In her reply brief, Hoffman attempts to present her argument differently, saying she "recognizes that [the Commission's] current process to resolve medical controversies is to use medical panels and that the current state of the law is that, where [the Commission's] decision is supported by a medical panel report, the Commission can satisfy the substantial evidence test." She asserts that this legal landscape "simply frames the inquiry in the instant appeal as being *whether* the [Board's] findings and decision on the issue . . . are supported by the medical panel report. If they are not, the [Board's] findings are not supported by substantial evidence." Thus, Hoffman presents her argument as claiming "not that the [Board] should have allowed higher dosages of opioid pain relief medication, but that, as to the level of opioids which the medical panel found necessary *and*

---

determination that her pain level or function did not change when her dosage was increased or decreased was not accurate.

Additionally, she disagrees with the medical panel about what level of opiates are necessary, saying that the panel declared the level of pain medication she was taking was "not really necessary because the later reduction of such prescription opioid pain medication did not kill her." She counters, "If life or death were to be the gauge for whether a medical treatment is reasonable (and whether the expense for such treatment is a 'reasonable' medical expense), insurance companies wouldn't have to pay anything."

But we do not address the medical panel's findings directly because Hoffman has not presented for our review the question of whether the Board abused its discretion in adopting the medical panel's report. *See Bade-Brown v. Labor Comm'n*, 2016 UT App 65, ¶¶ 8–10, 372 P.3d 44. And, as noted, "if the Commission's decision is supported by the medical panel reports, the substantial evidence standard is satisfied." *Morris v. Labor Comm'n*, 2021 UT App 131, ¶ 17, 503 P.3d 519, *cert. denied*, 509 P.3d 768 (Utah 2022). Therefore, Hoffman's arguments on these points are unavailing.

*appropriate* (after a structured weaning down process, at least going forward), whether Hartford should be paying for such lower level of opioid use."

## I. Past Expenses

¶27    On the topic of past expenses, Hoffman declares that "[t]he panel offered *no* opinion as to the *compensability* of such pain medication which Ms. Hoffman has been prescribed and used *in the past*."[4] Hoffman is incorrect. While the panel did not use the

_____

4. On this point, Hoffman asserts that Judge Rammell appropriately "found that '[Hoffman] properly relied on her treating physicians' recommendations at the time' and, then discussing and applying the precedents in [the two Board decisions discussed *supra* note 2] and adopting the same reasoning to govern his decision on the issue, he decided: 'A medical panel's later conclusions of excessive dosage should not be retroactively applied to punish [Hoffman] for following her physician's advice prior to the panel's involvement.'" We do not opine further on Judge Rammell's analysis because the Board's decision is "the final agency action resulting from formal adjudicative proceedings" that has been presented to us for judicial review. *See* Utah Code § 63G-4-403(1).

But we note that inasmuch as both Judge Rammell and the Board relied on the medical panel in reaching different conclusions about compensability, this is not the first time an ALJ and the Board have disagreed in their reading of a medical panel report. In *YESCO v. Labor Commission*, 2021 UT App 96, 497 P.3d 839, an ALJ relied on a medical panel report to determine that two injuries an employee suffered "were degenerative and/or congenital and not caused by a work-related activity." *Id.* ¶ 8 (cleaned up). "On review, the [Board] read the medical panel's report differently than the ALJ did." *Id.* ¶ 9 (cleaned up). "From the [Board's] perspective, the panel's report medically causally

(continued…)

word "compensable" related to its findings on what past medical care was necessary, it did make findings on the topic, which the Board properly relied on in determining the compensability of Hoffman's past care. As presented to the panel, the question of what past care Hoffman needed was clearly a question of what level of past care Respondents were liable for.

¶28   Hoffman herself acknowledges in her opening brief that, "[t]o be sure, a workers' compensation carrier can terminate ongoing medical care and medications as being unreasonable or unnecessary[5] . . . , but if a carrier does so before the Commission

---

connected [the employee's] work activities to his" injuries. *Id.* (cleaned up). "Accordingly, the [Board] remanded the case to the ALJ for further consideration," and "[t]he ALJ awarded [the employee] benefits on remand, largely echoing the [Board's] conclusions regarding medical causation." *Id.* On judicial review, this court highlighted that, "as the [Board] noted, [a] 'clear inference' from the medical panel's statement . . . , combined with the other opinions in the record, support[ed] the [Board's] medical causation finding." *Id.* ¶ 22. Thus, our conclusion that the Board's decision is supported by the medical panel's report ends our inquiry despite differences in interpretation of the medical panel's report between Judge Rammell and the Board.

5. Hoffman's situation is somewhat unique in that the parties had previously entered into a stipulation wherein Hartford agreed "to continue paying reasonable medical expenses related to the accepted injuries." Until Dr. Mattingly's defense exam, Hartford paid for the medical treatments that Hoffman's treating physicians prescribed. In other words, for some thirty years, Respondents indicated through their actions that the treatments prescribed by Hoffman's physicians were reasonable. After Dr. Mattingly's defense exam, Respondents presumably believed that those treatments were no longer reasonable and ceased paying for

(continued…)

authorizes it to do so, the carrier bears the risk of getting stuck with the bill." The Board stated that "[i]n Ms. Hoffman's case, that appears to be what took place" but that ultimately "the panel determined less medication was necessary than what had been prescribed by her treating physicians." Of course, the risk

---

them. We are sympathetic to Hoffman in that her reliance on high levels of opioids began and continued for some time with Hartford's apparent acceptance. And we note the unrebutted assertion that, in Judge Rammell's words, "when [Hoffman] began taking this combination of medications for which she now seeks reimbursement, '. . . high dose opioid prescriptions for chronic pain was the standard of care' along with concurrent benzodiazepine use." Accordingly, the medical panel could have determined that Hoffman's historic use of opioids was medically necessary, and we would decline to disturb the Commission's decision if it had relied on such a conclusion. But the panel did not so conclude.

Furthermore, while we observe that, generally, what is reasonable may include more than what is necessary, the question of whether the language of the stipulation ("reasonable medical expenses related to the accepted injuries") and of the Utah Code ("reasonable sums for medical, nurse, and hospital services [and] for medicines . . . necessary to treat the injured employee"), *see* Utah Code § 34A-2-418(1), align is not properly before us. And Hoffman has not sought reimbursement through an enforcement action of the parties' stipulation or on a theory of equitable estoppel by arguing that care deemed unnecessary by the Board may still have been "reasonable" for the purposes of the parties' stipulation or that she reasonably relied on the stipulation and Respondents' past acts. *See Benge v. Cody Ekker Constr.*, 2019 UT App 164, ¶ 20, 451 P.3d 667. We address only the question before us: whether the Board's findings regarding necessary medical care were supported by substantial evidence. And based on the Board's proper reliance on the medical panel's conclusions, the Board's findings are indeed supported by substantial evidence.

associated with seeking medical care not predetermined to be necessary flows in both directions. Just as an employer may be "stuck with the bill" if the care is later determined to have been necessary, so too may an employee face out-of-pocket expenses that may be later determined to be non-reimbursable. *Cf. Benge v. Cody Ekker Constr.*, 2019 UT App 164, ¶ 20, 451 P.3d 667 (declining to disturb the Commission's denial of coverage for two knee surgeries—despite an earlier surgery being covered—because a medical panel found that the later surgeries were not related to or caused by the empoyee's workplace injury). We do not condone Hartford's actions of cutting off all payments for Hoffman's medical expenses or, more generally, the actions of some employers or insurance carriers who leave injured employees to pay costs out of pocket and seek redress. *See Harding v. Industrial Comm'n of Utah*, 28 P.2d 182, 184 (1934) ("The insurance carrier . . . ought not wait until full investigation has been made before providing necessary care and treatment for injured [employees]."). However, from the time of the first defense exam, Hoffman was on notice that she might lose coverage for some or even all of her opioid medications. She could have—at any point afterward—gone through a weaning program and then sought reimbursement for it from Hartford. She did not do so. At any rate, when the panel was asked what past care was necessary to treat Hoffman's industrial injury, this was a question about what level of past care Respondents were liable for.

¶29 Hoffman attempts to split hairs by asserting that the medical panel determined what was necessary but not what was compensable, but in this context, they are one and the same. Judge Trayner's order indicates that Hoffman "claimed entitlement to . . . medical expenses" and that the "only issues before the Court [were] necessary medical care from 2016 to the present and recommended medical care to treat [Hoffman's] industrial . . . condition." Her memo to the medical panel made it clear that she was referring the case to the panel to settle the disputes on these

two questions. And the medical panel's report cannot be fairly interpreted as opining on any other topic than the care necessary for Hoffman that she is entitled to coverage for. Given these facts and the statutory backdrop that an "employer or the [employer's] insurance carrier shall pay reasonable sums for medical, nurse, and hospital services [and] for medicines . . . necessary to treat the injured employee," Utah Code § 34A-2-418(1), Hoffman's attempt to paint the panel's findings on past care as distinct from findings on compensability is unavailing.

¶30    The Board's decision is supported by the medical panel's report, so it is therefore supported by substantial evidence. *See Morris v. Labor Comm'n*, 2021 UT App 131, ¶ 17, 503 P.3d 519, *cert. denied*, 509 P.3d 768 (Utah 2022). We acknowledge that the medical panel's report is not the picture of clarity—particularly concerning past care, about which the panel introduces unnecessary confusion by using present and future tense verbiage. But the report definitively states that the panel has "decided that [Hoffman] 'needed' the 120 mg of OxyContin (extended release oxycodone) a day." It also states that "the benzodiazepine and Soma are clearly not medically necessary and are not indicated to treat chronic pain" and that "[t]he oxycodone 30 mg 5X/day is excessive and not medically indicated." The Board's findings are consistent with these: "With respect to Ms. Hoffman's past medical expenses[,] . . . the [Board] finds that Delta is only liable for the amount determined to be 'necessary' by the medical panel: 120 mg of extended release oxycodone without the benzodiazepine and Soma." Therefore, the Board's findings satisfy the substantial evidence standard. *See id.* ("Accordingly, if the Commission's decision is supported by the medical panel reports, the substantial evidence standard is satisfied.").

## II. Future Medication Expenses

¶31 We next decide whether the Board's determination regarding the compensability of future medications is supported by substantial evidence.

¶32 The Board stated that it "reads the panel's conclusion on the issue of future medical care as providing two alternatives: first, the recommended weaning from opioids; and second, the 180 mg of morphine equivalent or 16 mg or less of buprenorphine per day." This much is clearly supported by the medical panel's report:

> We believe that Dr. Jiricko's plan is the most ideal. . . . If [Hoffman] is unwilling to wean off her opioids, these are our recommendations:
>
> 1. Wean down to 180 mg of morphine equivalent dose a day (which is 90–120 mg oxycodone per day depending on [the] conversion ratio chosen). This can be a variation of OxyContin only, oxycodone only[,] or a combination of OxyContin and oxycodone.
>
> Or
>
> 2. Switch to Buprenorphine 16 mg or less a day.
>
> Regardless of which path she and her physician decide, she needs to stop using the benzodiazepine and Soma along with her opioid.

Because the Board's conclusion on this point is supported by the medical panel's report, it is supported by substantial evidence. *See Morris v. Labor Comm'n*, 2021 UT App 131, ¶ 17, 503 P.3d 519, *cert. denied*, 509 P.3d 768 (Utah 2022).

¶33 The Board further stated that it "views the reason for alternatives to be unimportant." It said, "Whether Ms. Hoffman hesitates to begin the weaning program or whether Delta somehow delays authorization for such program, the panel outlined the necessary pain medication for her work-related low-back condition." At first glance, it may appear that the Board diverges from the panel's recommendation that Respondents provide Hoffman with an opportunity to wean by implicitly deciding that the alternative options for coverage below Hoffman's current medication levels engage immediately. However, the Board is clear that Respondents are still liable for covering the costs associated with a weaning program if Hoffman engages in one, adding a footnote stating, "[I]f, as Ms. Hoffman seems to imply, she wants to undergo the detoxification program with accompanying therapy recommended by the panel but Delta delays in paying for it, Ms. Hoffman can seek to enforce the award of the cost of such treatment through the courts." Accordingly, the Board's conclusions about the compensability of future medication expenses are supported by the medical panel's report and are therefore supported by substantial evidence. *Id.*

¶34 As to Hoffman's future use of benzodiazepine and Soma, the Board impliedly denies future coverage of these medications in line with the medical panel's recommendations. However, the panel also referred to other medications: "There are better medications to treat her anxiety and sleep disorder with less risk profile." The Board's decision does not deny these other medications, so it affirmed Judge Rammell's ruling in this respect. Judge Rammell ruled that Respondents are "obligated to pay for the expenses associated with the recommended future treatment" according to "the medical panel's recommendations," presumably including this recommendation. So, while Respondents are not liable for the future cost of benzodiazepine and Soma, they are responsible for the cost of more-effective,

lower-risk medications to treat Hoffman's anxiety and sleep disorder.

## III. Other Treatments

¶35    Hoffman asserts that expenses for "additional medical treatment modalities," including a home exercise machine and housekeeping, are reasonable. On this point, the Board affirmed Judge Rammell's decision that stated,

> [A] preponderance of the evidence demonstrates the potential benefits to [Hoffman] of regular exercise, but there is no such preponderance regarding the medical necessity of a [Bowflex] machine specifically. Similarly, there is no preponderance of evidence to support the medical necessity of a spinal cord stimulator, hot tub, or housekeeping service. Thus, . . . because those courses of treatment were not recommended by the medical panel, and without an independent preponderance of the evidence to support them, the Court does not find these treatments "necessary" and Respondent[s] [are] not liable to cover those expenses.

¶36    The Board's denial of coverage for these other treatments is supported by the medical panel's recommendations:

> We do not believe she would benefit from the spinal cord stimulator to improve function or reduce medication. . . .
>
>        We do not believe a [Bowflex] machine is medically indicated. Exercise is indicated and recommended, but virtually all forms of exercise are helpful (walking, swimming, core strength, yoga, etc.), but a specific brand name device is not needed.

> We do not believe she would benefit from a hot tub. There is no scientific evidence to suggest hot tubs improve function or help chronic low back pain.
>
> We do not believe housekeeping is medically necessary for her low back pain. She currently chooses to employ housekeeping services, but her current yard and animal care have similar physical requirements. Having housekeeping has not improved her function[,] nor has it allowed her to reduce her opioid use.

Because the Board's conclusions are supported by the medical panel's report, they are supported by substantial evidence. *See Morris v. Labor Comm'n*, 2021 UT App 131, ¶ 17, 503 P.3d 519, *cert. denied*, 509 P.3d 768 (Utah 2022).

¶37 But again, the Board's decision did not deny other treatments recommended by the medical panel or ordered by Judge Rammell. Judge Rammell ruled that Respondents are "obligated to pay for the expenses associated with the recommended future treatment" according to "the medical panel's recommendations." The panel recommended "a [p]sychiatry evaluation to treat [Hoffman's] anxiety from the chronic pain and [a] [s]leep specialist evaluation to treat her sleep disorder from chronic pain." The panel also stated, more generally, that as to future care, "Dr. Jiricko's plan is the most ideal." Dr. Jiricko's plan included recommendations for "a robust cognitive behavioral therapy training . . . and psychiatric evaluation for anxiety and medication management. Also, 10 to 12 sessions of physical therapy for [Hoffman's] right leg." Accordingly, all of these treatments were impliedly recommended by the medical panel, ordered by Judge Rammell, and approved by the Board. So Respondents are responsible for

the costs associated with these other treatments, if Hoffman undergoes them.

CONCLUSION

¶38    The Board's decision is supported by substantial evidence. Accordingly, we decline to disturb it.

_____